**REPUBLIC PETROLEUM CORPORATION**

v.

**UNITED STATES of America.**

**Lucy COCCHIARA, wife of/and Louis J. Roussel**

v.

**UNITED STATES of America.**

**Civ. A. Nos. 73–866, 73–2467.**

United States District Court, E. D. Louisiana.

June 20, 1975.

---

Peter J. Butler, New Orleans, La., for plaintiffs.

Scott P. Crampton, Asst. Atty. Gen., Washington, D. C.; Steven Shapiro, William W. Guild, Fleming T. de-Graffenried, Asst. U. S. Attys., United States Dept. of Justice, Dallas, Tex.; Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., for defendant.

HEEBE, Chief Judge:

In these consolidated actions, Louis J. Roussel and his wife in Civil Action No. 73–2467 and the Republic Petroleum Corporation in Civil Action No. 73–866 seek a refund of taxes they allege were erroneously assessed and collected for the years 1959–1966. Due to the number, variety and complexity of the issues involved, we have undertaken to discuss each issue separately, and have followed the numbers assigned to each issue by the parties. The omission of several numbered issues is explained by the fact that they were conceded by one side or the other. Issues 9, 17, 24 and 25 were conceded by the government in favor of the taxpayer while the taxpayer conceded Issue 23 in favor of the government. The following discussion of the tax issues tried to the Court without a jury shall serve as our findings of fact and conclusions of law.

## ISSUE 1

Prior to trial the government filed a motion for partial summary judgment on the grounds that the statute of limitations barred certain of plaintiff Roussel's claims for refund. The applicable statute, § 6511 of the Internal Revenue Code, provides that a claim for credit or refund of an overpayment must be filed "by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later . . .." " Further, § 7422 precludes the filing of a suit to recover "any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed . . .."

The taxpayer timely filed returns for each of the years in question, 1959–1966, and paid the taxes shown due thereon at the same time. On February 28, 1972, the IRS determined that for each of those years, except for 1960 and 1962, the taxpayer owed additional taxes. "Quick Assessment" notices were, therefore, issued for those years. For 1960 and 1962 the IRS apparently disallowed certain deductions and losses claimed by the taxpayer, but also determined that certain income reported in those years was properly reportable instead in 1959.

The taxpayer's overpayment of taxes resulting from the erroneous inclusion of income was thus applied to satisfy the taxpayer's tax deficiency caused by the disallowance of the deductions and credits. Since the overpayment exceeded the deficiencies for both 1960 and 1962, the taxpayer was credited on March 6, 1972, with a net overpayment for those years. The additional taxes assessed by IRS were paid on March 13, 1972. On August 15, the taxpayer filed claims for refund for the years 1959–1966.

The government contends that the taxpayer is now barred from making a claim for the refund of taxes attributable to the disallowance of the deductions and losses in the years 1960 and 1962. The government's theory is that the taxes paid by the taxpayer for those years were paid in 1961 and 1963, respectively, with the filing of the appropriate tax returns. The claims for refund filed in 1973 were, therefore, according to the government, filed more than three years from the filing of the return and more than two years from the payment of the tax.

We disagree. The taxpayer in the case at bar merely wishes to contest the action of the IRS in disallowing certain deductions and losses for the years 1960 and 1962. He contends, in effect, that the IRS action was erroneous in this respect and that he is entitled to a larger credit or refund for those years than was given him. This claim could obviously have not been made by the taxpayer until the action of the IRS in 1972, well after three years from the filing of the return. But it does appear that the taxpayer's claim for refund was filed within two years from the time the tax was "paid." The taxpayer's additional tax liability resulting from the disallowance by the IRS of the disputed deductions and losses is the allegedly erroneous assessment giving rise to the claims for refund. That liability was satisfied or "paid" when the IRS applied the credit the taxpayer otherwise would have received because of his erroneous inclusion of income for the two years in question to satisfy the additional assessments. This offsetting of added tax liability against overpayment must be deemed to constitute payment of the additional tax liability. Otherwise, we fail to comprehend how the taxpayer could contest the action of the IRS in disallowing the deductions and losses in question. *See* Rosenman v. United States, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535 (1944). Therefore, to the extent the government's motion would preclude the taxpayer from litigating the legality of the disallowances, it is hereby denied.

With respect to the taxpayer's claims for refund for the remaining years, the

government points out that the taxpayer made claim for the refund of all taxes paid for those years.

 The taxpayer's motivation for making such claims was to protect himself against the possible payment of a double tax on the same income resulting from the taking of inconsistent positions by the IRS. The government is correct in its position that § 6511 bars the taxpayer from claiming a refund in 1973 for taxes paid with the filing of his returns in the years 1959–1966. His refund claims were timely filed only with respect to the additional taxes paid in 1972 to satisfy the quick assessments of the IRS. Should the taxpayer's fears concerning a double payment of taxes prove to be justified, his proper remedy is to seek relief under the mitigation sections of the Internal Revenue Code, §§ 1311–1315.

The government's motion, then, is hereby granted to the extent that it would bar the taxpayer from claiming a refund for taxes paid with the filing of his returns for the years in question.

## ISSUE 2

Republic Petroleum Corporation was founded by Louis J. Roussel in 1941. During the years 1959–1966, Roussel was the majority shareholder of the corporation and its ultimate decision maker. In July 1959, he decided to transfer the ownership of the Bollinger-Melancon mineral leases from himself to Republic. The confusing transaction through which this was accomplished has led to this dispute in which the IRS questions the right of the taxpayer to treat the sale of the leases to his own corporation as an installment sale under the provisions of § 453 of the Internal Revenue Code.

The leases in question were burdened with a mortgage in favor of the Whitney National Bank of New Orleans, the balance of which was then $1,950,000.00. On July 24, 1959, Roussel signed a document entitled "Act of Sale and Assumption of Mortgage" by which the leases were "sold" to Republic. This contract contains the following language:

"This sale is made and accepted for and in consideration of the sum of TWO MILLION and NO/100 DOLLARS ($2,000,000.00), in part payment and reduction whereof, the present purchaser has paid the sum of FIFTY THOUSAND and NO/100 DOLLARS ($50,000.00) in cash, receipt of which amount the said vendor hereby acknowledges and grants full balance of said purchase price, to-wit: the sum of ONE MILLION NINE HUNDRED FIFTY THOUSAND and NO/100 DOLLARS ($1,950,000.00), *the present purchaser assumes, binds and obligates itself for the payment of the indebtedness of vendor under that certain mortgage note* in the amount of Two Million, Five Hundred Thousand and No/100 Dollars ($2,500,000.-00), dated July 9, 1957, payable to the order of Bearer and due on demand at the Whitney National Bank of New Orleans, bearing interest at the rate of five and one-half percent (5½%) per annum from date, which note is paraphed "Ne Varietur" by Kalford K. Miazza, Notary Public for Orleans Parish, to identify it with an act of Mortgage and assignment passed before the said Notary Public on July 9, 1957, and of record in Mortgage Book 57, folio 56 of the Mortgage Records of Lafourche Parish, Louisiana, under Entry No. 151–387; the present indebtedness hereby assumed being the sum of One Million, Nine Hundred and Fifty Thousand and no/100 Dollars ($1,950,000.00).

*"The said purchaser, Republic Petroleum Corporation, does hereby bind itself to the full and final payment and discharge of said mortgage note and of the liabilities and obligations expressed and stipulated in the said act of mortgage and assignment hereinabove mentioned;* and the said purchaser does take cognizance of all of the terms, provisions and conditions in the said act of mortgage and as-

signment, and *is being purchased subject to all of said terms, provisions and conditions contained in the said act of mortgage and assignment."* (emphasis added)

Roussel's intention that Republic would assume his mortgage liability to the Whitney Bank is, needless to say, clearly and unequivocally expressed in this document. Nevertheless, Roussel testified that despite the clear language of the act of sale, it was never his intention that Republic assume the mortgage liability encumbering the leases, and that when he was informed that the act of sale provided for such an assumption several days after signing the document, he was most surprised. Consequently, Roussel caused the following letter to be drafted on behalf of Republic to himself which reads as follows:

"Dear Mr. Roussel:

"This will evidence our agreement that you will accept a note from this corporation in the full sum of $1,950,000 to cover the balance of the purchase price of Valentine Field leasehold interests, in lieu of a formal assumption by this company of the obligation now owing by you to Whitney National Bank of New Orleans, as provided in the act of sale and assumption of mortgage executed before Edward J. Boyle, Notary Public, on July 24, 1959, but that except for the deviation herein agreed upon the said act of sale and assumption of mortgage shall remain in force and effect.

"We deliver to you herewith our promissory note dated July 24, 1959, in the principal amount of $1,950,000.-00, payable in monthly instalments of not less than $25,000, interest payable monthly at the rate of 5½% from date through December 31, 1959, and at the rate of 6% thereafter; it being understood and agreed that we may anticipate the payment of principal at any time and from time to time as we may elect, without penalty, by additional payments on the said principal.

"Please sign in the space provided below as your confirmation of the foregoing agreement and as your receipt for the above described note.

"Very truly yours,

"REPUBLIC PETROLEUM CORPORATION"

The promissory note was secured by Roussel's own promissory note to the Whitney Bank secured by the mortgage on the leases.

Roussel began to receive checks from Republic which he contends were payments under the promissory note. However, a review of the checks reveals that the payments made were in no way related to the payments contemplated by the promissory note. For instance, under the terms of the note, Republic was obligated to pay Roussel a minimum of $25,000 per month plus the specified interest. Yet, it was not until the month of January 1960 that Roussel received at least that minimum amount. The amounts he received, were, however, directly related to the payments due to the Whitney Bank under the mortgage encumbering the leases. As these payments came due, Roussel, as President of Republic, merely wrote himself a check in the amount of the mortgage payment then due and promptly deposited the check to his account at the Whitney Bank. It is unmistakably clear that from the time of the act of sale, Republic undertook to satisfy Roussel's obligations to the bank, in accordance with terms of the original contract. Republic's own check stubs reflect this arrangement. On November 6, 1959, for example, Republic wrote a check to Roussel in the amount of $9,735.91 which Roussel now contends was a payment under the promissory note. However, at the time Roussel wrote the check on behalf of Republic, the check was described as a payment "to reimburse interest charges paid by you to Whitney National Bank." Why would Republic reimburse Roussel for interest payments he had made on the mortgage

unless it had assumed the obligation to make such payments? On another occasion, a $35,000 check to Roussel, dated June 20, 1960, was described on Republic's books as a "Payment on Mortgage Loan." Republic's own records, then, for which Roussel bears full responsibility, reflect that, in substance, Republic was paying off the mortgage note to the Whitney Bank and not the promissory note to Roussel.

By February 1961, the mortgage indebtedness had been reduced to $1,542,150.11. On February 17, 1961, Roussel executed a new promissory note payable to Republic in the amount of $1,163,650.11, the proceeds of which he applied toward the satisfaction of the final balance due on the mortgage indebtedness. From that point on, Roussel and Republic paid each other monthly checks under the two promissory notes. Since the amounts of these checks were virtually the same, they offset each other, so that, in reality, little, if any, money actually changed hands.

█ The net profit to Roussel on the sale of the leases amounted to $1,970,574.50. On his personal income tax returns for the years 1959–1965, Roussel reported that gain on an installment basis. The IRS concluded, however, that the sale in question was not entitled to be treated as an installment sale, and that, therefore, the full profit derived from the sale was taxable in 1959. In Roussel's initial claim for refund for 1959, he fully admitted that Republic had "assumed a mortgage liability as part payment . . ." for the leases. On February 6, 1974, less than one month before trial, he filed an amended claim for refund in which he contended that ". . . no mortgage obligation was ever assumed by purchaser, and further that it never was the intention of the parties that purchaser would assume any indebtedness owed by vendors." Considering the fact that Roussel had full control over all aspects of the transaction, his own uncertainty as to what transpired serves to empha-size the confusing nature of the sale. Suffice it to say, however, that from the date of the act of sale until one month before trial, Roussel believed Republic had assumed his mortgage liability.

█ Under § 453 of the Internal Revenue Code, a taxpayer may treat the gain from a sale of real property involving deferred payments on an installment basis so long as he receives no payments during the taxable year of the sale or the payments received in that year do not exceed 30% of the selling price. Treas.Reg. § 1.453–4(c) further provides:

*"Determination of 'selling price.' In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser,* shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the 'selling price' *and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and §§ 1.453–1 through 1–453–7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property."* (emphasis added)

The general purpose behind § 453 is to relieve taxpayers from having to pay an income tax in the year of sale based upon the full amount of anticipated profits when in fact they had received in cash only a small portion of the sales price. Irwin v. C. I. R., 390 F.2d 91 (5th Cir. 1968).

█ On the other hand, we are mindful that the installment sale provisions are "relief provisions and exceptions to the general rule as to the year for reporting income, and as such they must be strictly construed." 2 Mertens, Law of Federal Income Taxation, § 15.–01, p. 3. Moreover, this transaction merits especially close scrutiny, inasmuch as it involves a sale by a taxpayer

to a corporation controlled by him. For a variety of reasons, we believe the IRS was correct in disallowing installment treatment of the gain from the sale, on the grounds that since Republic assumed Roussel's mortgage obligation which was far in excess of his basis in the leases, Roussel received more than 30% of the selling price.

In the first place, the confusion which surrounds the sale in question exists for the simple reason that the taxpayer was, in reality, dealing only with himself. He was therefore free to enter into an "agreement" one day providing for an assumption of his mortgage by Republic and then several days later execute a letter on behalf of Republic clarifying the intent of the "parties" to the sale. This type of manipulation would, of course, be impossible in a bona fide arms-length transaction. Under the circumstances, we believe that Roussel should be bound by the clear and unambiguous terms of the official witnessed and notarized document evidencing the sale of the leases to Republic, rather than a letter written as an afterthought for reasons which have yet to be adequately explained. We do not believe, as suggested by the taxpayer, that he failed to understand the import of the official act of sale due to the fact that he had no legal expertise and no formal education beyond the seventh grade. To the contrary, Roussel impressed the Court as being an astute businessman and financier, well-versed in the law insofar as applicable to his affairs. By the terms of the act of sale, then, Republic legally relieved Roussel of the final responsibility to pay off the balance of the mortgage and accepted that responsibility in his stead. Roussel therefore received more than 30% of the purchase price at the time of the sale. Ledford v. United States, 492 F.2d 1186 (9th Cir. 1974).

■■ Furthermore, the substance of what transpired subsequent to the execution of the act of sale seems to be consistent with the provision of that document calling for an assumption of the mortgage by Republic. The payments received by Roussel were obviously not the deferred sales price installments contemplated by the promissory note executed in favor of Roussel. Regular monthly payments of at least $25,000 were not always made. Instead, Republic was paying off the mortgage indebtedness by channeling payments due the bank through Roussel under the guise of the promissory note. Under such circumstances, the use of the promissory note begins to take on sham-like qualities. It was merely a device utilized by the taxpayer to disguise an assumption of a mortgage as an installment sale. We further find the "loan" which Roussel obtained from Republic to pay off the final balance on the mortgage to be of the same character. We, of course, are duty bound to give effect to the substance of the transaction rather than the form employed by the taxpayer. *See* Hindes v. United States, 326 F.2d 150 (5th Cir. 1964). "A sale on the installment basis that lacks reality will be no more efficacious in avoiding taxes than any other type of sale." 2 Mertens, *supra*, p. 3. Republic was not only legally bound by the terms of the act of sale to assume the mortgage, but it also proceeded in substance to do just that. There is no doubt that it was Republic which made the mortgage payments.

■ Even if we gave effect to the promissory note, we believe the action of IRS was correct. Under the terms of the promissory note executed by Roussel on Republic's behalf in favor of himself, Republic reserved the option to "accelerate payment of principal hereunder at any time and from time to time . . . ." Since Roussel controlled Republic, he had the right to pay himself whatever amount of the purchase price he wanted at any time. Under these circumstances, we believe the taxpayer had constructively received or had a beneficial interest in the full purchase price at the time of the execution of the note. In Rhodes v. United States, 243 F.Supp. 894 (W.D.S.C.1965), a taxpayer was de-

nied installment sale treatment when she arranged for the full amount of the purchase price to be placed in an escrow account under instructions to the bank to pay her yearly installments. The court determined that since the taxpayer could have unconditionally obtained the full purchase price directly in cash but for her own imposed volition, she was in constructive receipt of the full purchase price in the year of sale. We believe the situation in the case at bar to be analogous. Roussel was in a position to have legally obtained the full amount of the purchase price whenever he so desired under the terms of the note, and, therefore, had a beneficial interest in that sum sufficient to disqualify the transaction as an installment sale.

For the above reasons, we conclude that the full amount of the profit derived from the sale of the leases by the taxpayer to his corporation is taxable in the year of the sale as found by the IRS.

### ISSUE 3

During the years in issue, taxpayer owned 100% of the stock of, among others, three corporations, American Stocks, Inc., Louisiana Royalties, Inc., and Empire Land Corporation. In assessing tax deficiencies against the plaintiff, the IRS disregarded these corporations as separate taxable entities and attributed their income and expenses to the taxpayer. The basis of this action was that the three corporations served no useful business purposes and that, in reality, their transactions were the transactions of the taxpayer. The government defends this position by pointing to several undisputed facts about the corporations in question. The three corporations were entirely owned and directed by the taxpayer. They had no separate offices or telephones, instead they used the taxpayer's office and telephones. The three had no employees and paid no wages. There is also no dispute that the principal business activity of the three corporations was the management of a variety of investments.

Each owned real estate, stocks and other assets and had accounts receivable and accounts payable. Their income consisted mainly of dividends, interest, income from investments and gains on the sales of capital assets. In addition, Empire Land collected and paid oil and gas royalties. Each corporation used its own funds to purchase assets and to satisfy debts. Separate books and records were kept and separate board meetings were held.

Our point of departure in determining whether these corporations are entitled to be recognized as separate taxable entities is the leading Supreme Court case on the subject, Moline Properties v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). In that case, a corporation was formed in order to protect the investments of the creditors of the mortgagor who continued to manage and regard the property as his own individually. In holding that this corporation was a separate taxable entity, the Court stated at 438–439, 63 S.Ct. at 1134:

> "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, *so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation,* the corporation remains a separate taxable entity." (emphasis added)

The Court found that in discharging the original mortgage obligation, in subsequently remortgaging the property and in renting and selling the property, the corporation had carried on the requisite business activity. Under *Moline,* then, our inquiry must be directed towards ascertaining whether the taxpayer's corporations "carried on business." The degree to which they were owned and controlled by Roussel is of little significance, for what *Moline* and its extensive

progeny make clear is that an individual may choose to conduct his business affairs through the device of a wholly owned corporation, so long as that corporation actually transacts some business or serves some legitimate business purpose. This holding was further buttressed by National Carbide Corp. v. Commissioner, 336 U.S. 422, at 429, 69 S.Ct. 726, at 730, 93 L.Ed. 779 (1948), in which the Court, citing *Moline* stated:

". . . we have held that a corporation formed or operated for business purposes must share the tax burden despite substantial identity, in practical operation, with its owner. Complete ownership of the corporation, and the control primarily dependent upon such ownership . . . are no longer of significance in determining taxability."

In emphasizing the lack of significance in finding an identity of the corporation with its owner, the Court acknowledged at 431–432, 69 S.Ct. at 731 that its holdings had established that

". . . when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference taxwise."

The Court further stated at 433, 69 S.Ct. at 732 that "Undoubtedly the great majority of corporations owned by sole stockholders are 'dummies' in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually." The three corporations at issue are, of course, such "dummies," through which the taxpayer manages his extensive investments. The government's assertion that the transactions of these corporations were, in reality, the transactions of the plaintiff can hardly be disputed, but, as is made clear by *Moline* and *National Carbide,* such a conclusion, in and of itself, does not warrant the disregarding of the corporations as separate taxable entities.

 We turn, then, to the question of whether the taxpayer's corporations conducted the requisite amount of business activity. The evidence is virtually uncontroverted that each earned income from a variety of investments, bought and sold assets and loaned and borrowed money. The proper corporate form was followed for all transactions. In both quantum and quality, this consistent corporate activity, despite the lack of telephones or employees, far exceeds that which the Supreme Court and many lower courts have recognized as sufficient to satisfy the *Moline* and *National Carbide* standards. *See, e. g.,* Taylor v. C. I. R., 445 F.2d 455 (1st Cir. 1971); Coca-Cola Bottling Co. of Gallup v. United States, 443 F.2d 1253 (10th Cir. 1971); Britt v. United States, 431 F.2d 227 (5th Cir. 1970) and cases discussed therein at 235–237; Tomlinson v. Miles, 316 F.2d 710 (5th Cir. 1963). Since the three corporations conducted the requisite business activity, each is entitled to be recognized as a separate taxable entity.

## ISSUE 4

In the spring of 1964, Gillis Long rendered legal services for the plaintiff corporation and Superfine Oil and Gas Company, Inc., in connection with their acquisition of two mineral leases situated in Texas. For these services, Long charged the corporations $500.00. However, in lieu of cash, Long agreed to accept an oil payment of $40,000. Under the terms of this payment, Long would receive $\frac{1}{16}$ of $\frac{7}{8}$ of the production from these leases, up to a maximum of $40,000. It is unclear to us precisely when Long agreed to this form of compensation and whether at that time it was known that the wells were productive. We do know that when the assignment was actually made, oil had been struck, rendering the value of the oil payment far in excess of $500.00.

Plaintiff corporation owned 75% of the working interest in these leases and Superfine owned the remaining 25%. The IRS concluded that Republic's maximum pro rata portion of the oil payment, $30,000, should have been treated as ordinary income to the corporation under the theory that the assignment constituted an anticipatory assignment of its future income to Long. It further characterized the payment as a constructive dividend to Roussel on the grounds that Long's services had been rendered for Roussel rather than for the corporations. The oil payment was thus treated as an anticipatory assignment of that dividend by the corporation to Long. Consequently, the government determined that the $30,000 should have been included as taxable income to Roussel in the nature of a constructive dividend with a $500.00 deduction allowed for Long's legal services.

■ First, we agree with Roussel that his income should not have been increased by $29,500. The evidence is clear that Long's services were rendered on behalf of Republic and Superfine, the two entities which were involved with the purchase of the mineral interests in question. The fact that Roussel controlled these corporations and would ultimately reap the benefits of these services obviously does not change this result. The oil payment to Long by Republic cannot be considered an anticipatory assignment of a constructive dividend of Roussel.

■ However, it is apparent that under the applicable law, the plaintiff corporation, in assigning the oil payment to Long, made a grant of its own future income to him by anticipatory assignment and hence realized taxable income as if it had received the oil payments in question. Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958). The law is clear that a taxpayer such as Republic "cannot escape taxation by legally assigning or giving away a portion of the income derived from income producing property retained by the taxpayer." Estate of Stranahan v. C. I. R., 472 F.2d 867 (6th Cir. 1973). Our conclusion in this respect is buttressed by the fact that, as will be explained below, the assignment was, for all intents and purposes, a gratuity. See Estate of Stranahan, supra, at 870. See also Greer v. United States, 408 F.2d 631, 634 (6th Cir. 1969). The Lake case makes it clear that the assignment of an oil payment constitutes the assignment of the right to receive future income. However, the government is in error in seeking to increase Republic's taxable income by the full amount of $30,000 in the year of the assignment. Republic did not receive a lump-sum consideration for the assignment of the oil payment, as did the taxpayer in Lake. It would, therefore, be unfair to tax Republic on income before that income has been earned and paid to Long. That is especially so in the situation at bar since the full amount ultimately to be paid under the oil payment was unknown at the time of the assignment and is still unknown today. In fact, as of February 1974, Long was paid only $23,000 of the $40,000 maximum payable under the assignment. The plaintiff corporation may, therefore, be taxed on the payments to Long only as they are earned and paid.

■ Finally, Republic argues that if, as we have found, the assignment of the oil payment constituted an anticipatory assignment of income, then the amounts so assigned should be deductible as legal expenses. The evidence, however, falls far short of convincing us that the assignment of a $40,000 oil payment to satisfy a $500.00 legal bill was either ordinary, necessary or reasonable. As noted above, it is difficult to ascertain whether oil had already been struck when Long agreed to the assignment. Roussel claims that at that time the value of the $40,000 assignment was entirely speculative. Nevertheless, it is clear that when the assignment was actually executed, oil had been hit. In fact, within hours of the assignment, Long

was able to assign it as collateral for a $40,000 loan from the National American Bank, a bank controlled by Roussel. Needless to say, Long would have been foolish not to take what Roussel characterizes as a gamble. By the same token, we do not believe a reasonably prudent businessman would risk $40,000 to avoid the payment of a $500.00 legal fee. Republic is entitled to a deduction for paying Long's fee, but only in the amount of $500.00.

## ISSUE 5

In 1957, plaintiff Roussel personally acquired ownership of the Bollinger-Melancon mineral leases. By 1959, Roussel was embroiled in a dispute with the lessors as to whether he had complied with the terms of the lease instrument. On July 24, 1959, Roussel sold the leases to Republic, as is more fully explained in Issue 2. Subsequent to this transfer, the lessors filed a suit against both Roussel and Republic, the primary purpose of which was to cancel the lease. This suit was ultimately settled on the basis that lessors Bollinger and Melancon would receive a 1/16 interest in the lease, calculated to be worth $116,853.13, and a carved-out production payment in the amount of $90,000 which represented the lessor's allotted portion of the prior production of the 1/16 assigned interest.

The act of sale by which Roussel sold these leases to Republic provided that Roussel was making the sale with all legal warranties. This provision, according to the IRS, obligated Roussel to forever defend Republic from claims against its title to the lease. Consequently, the sums expended by Republic to settle the suit and the legal expenses it incurred in connection therewith constituted the payment by a corporation of a shareholder's debt, and, as such, represented income to the shareholder. Roussel's taxable income was, therefore, increased by the amount of $239,353.13 which was the sum of the settlement plus Republic's legal fees. We conclude

that the IRS erred in making this adjustment.

 The law of Louisiana provides, as does the law in general, that the warranties expressly or impliedly made by a vendor of real property interests are breached only upon a failure of the title conveyed to the vendee. See LSA–C.C. arts. 2449, 2500, 2501, 2506; 20 Am.Jur.2d Covenants, Conditions, and Restrictions. The costs and expenses incurred by a vendee in defense of the title conveyed are recoverable from the vendor *only* if the defense of the suit was unsuccessful, 20 Am.Jur.2d, *supra*, § 150. Here, of course, there is no proof whatsoever that Roussel did not have the title to the disputed leases which he purported to convey to Republic. This question was, obviously, never reached, since the suit in which it might have been determined was compromised. The government has failed to cite any authority for the proposition that the settlement of a suit by a vendee to protect its title to a lease constitutes a breach of warranty by the vendor. Since the crucial element, proof of a defective title, has never been established, the warranty was never breached. The sums expended by Republic in settling and defending the lawsuit were properly considered to be the expenditures of the corporation and not the warranting vendor, Roussel.

 However, for the reasons explained in Issue 4, the $90,000 carved-out production payment assigned to Bollinger and Melancon represents an anticipatory assignment of Republic's income. Republic's taxable income was therefore properly increased by that amount by the IRS.

 Further, for the reasons explained in Issue 26, the sums expended by Republic in settling and defending the lawsuit in question may not be deducted as business expenses. Since they were incurred in connection with the defense of a suit brought to cancel a disputed lease, such expenses must be capitalized.

We note that the plaintiff concedes that the $12,500 legal fee paid by Republic to attorney Miazza constituted income to himself.

## ISSUE 6

In 1964 and 1965, Sam J. Recile made certain payments to persons close to plaintiff Roussel and to one of his corporations which the IRS contended constituted income earned by Roussel. His taxable income for those years was accordingly increased by the sum of the questioned payments. Roussel has conceded that certain payments made by Recile to his son, Louis J. Roussel, III, and daughter, Charmaine R. Morel, were, in fact, income which he had earned. However, Roussel maintains that the remainder of the payments were earned by the recipients and not by himself.

In 1965, Roussel's son and daughter each received $7,500 checks from Recile. Roussel contends that these sums were paid pursuant to a letter agreement between Recile and his children. According to this agreement, addressed to Charmaine Morel and Louis J. Roussel, III, "Individually and/or as Agent for Others," Recile agreed that if "you or one of your entities" advanced $50,000 to him for six months in connection with the purchase of some property, Recile would assign a one-third interest on all profits above $60,000 derived from the resale of the property. The $15,000 received by the children represented one-third of such profits.

█ Roussel testified that he loaned the $50,000 to his children who then, in turn, loaned the money to Recile. The problem we have with this transaction is that we have seen no proof of such a bona fide loan. What we do know suggests that Roussel merely channeled the money through his children so that the income derived from the transaction could be shifted to them. According to Roussel's own deposition testimony, these monies had not been earned by his children. Roussel stated that Recile had suggested, " 'How about putting the children in there,' you understand, and I would say 'all right, put them in there and I will furnish whatever money or services are required.' " His son admitted that he had had no business dealings with Recile, and it further appears that his daughter was in Alaska at the time of the transaction in question. The $15,000 was unquestionably income derived from a $50,000 loan made by Roussel himself and not by his children. The government correctly increased Roussel's taxable income by that amount.

With respect to Recile's payments to Rena V. Taylor, totaling $53,000, the evidence indicates and we find that such monies were properly earned by her and not by Roussel. A portion of that amount represented compensation to her for her efforts in securing tenants for an office building Recile was constructing. $5,000 was paid to her as a fee for a loan. The remainder satisfied a debt arising out of the sale of stock by Taylor to Recile in 1963. Therefore, none of the $53,000 is properly taxable to Roussel.

█ Finally, in 1965, American Stocks, Inc., one of Roussel's corporations, received $16,000 from G. Brian Corporation, one of Recile's corporations, which the government erroneously seeks to attribute to Roussel himself. We find that G. Brian Corporation paid American Stocks $11,000 as a bonus for a $250,000 loan of its own funds. The remaining $5,000 was paid as consideration for an extension of the due date on the loan. From the evidence before us, the transaction appears to have been a bona fide loan of American Stocks and not of Roussel, and the income derived from it was, therefore, earned by American Stocks, Inc.

## ISSUE 7

█ For the year 1964, the income of plaintiff Roussel was increased by the sum of $38,200 by the IRS on the grounds that Roussel purchased a tract of land from Sotan, Inc., for $50,000 when it had a fair market value of

$88,200 with the bargain element constituting a payment for services rendered by Roussel to the vendor. While the government did not formally concede this issue at trial, it offered no evidence to rebut the testimony of Roussel denying that he had made a bargain purchase in return for services rendered. We, therefore, conclude that the transaction in question did not result in income to the taxpayer.

## ISSUE 8

In 1961 plaintiff Roussel purchased 150,000 shares of the stock of the Southern Land Title Corporation for the sum of $1,500. In 1964 he sold these shares back to Southern Land for $48,000 and reported the resulting profit as a capital gain. The IRS, however, contended that the $48,000 was not received by Roussel as consideration for the sale of the stock, but represented a payment to Roussel for services he had rendered in arranging for a $1,500,000 loan to Southern Land. As such, the IRS believed the $48,000 should have been reported as ordinary income. As in Issue 7, the government offered no evidence to rebut the testimony of Roussel that the $48,000 was not a payment for services rendered but constituted consideration for the sale of the stock. We, therefore, conclude that the sale of the stock to Southern Land did not result in ordinary income to Roussel, but was properly reported by him as a capital gain.

## ISSUE 10

In 1964, Roussel informed Justice John B. Fournet, former Chief Justice of the Louisiana Supreme Court, that he was about to purchase a large quantity of Universal Drilling Company, Inc., stock for $1 per share from Port Houston Iron Works, Inc. Justice Fournet told Roussel that if he was able to consummate the purchase, he would appreciate the opportunity to buy 4,000 shares of that stock from Roussel at the same price. On September 11, 1964, Roussel wrote the following letter to Justice Fournet:

"Dear Judge Fournet:

"Quite a while ago, when Gulf Natural Gas Corporation stock was selling for $2 per share, you asked me to buy 3,000 shares for your account. At or about the same time, we purchased from Port Houston Iron Works, Inc., a block of Universal Drilling Company shares at $1 per share, and I agreed to let you have 4,000 shares of this stock at the price we paid.

"Due to the long lapse of time, I would like to know your wishes in this matter. Should you still wish to take the stock, I will be glad to deliver it at the cost price if you will deliver your check for the total amount of $10,000.

"Please understand that you are not obligated to take this stock if for any reason you do not wish to do so. I have been carrying it on my own books as my personal stock; this, for the reason that I felt you should not be placed in a position of being forced to take the stock.

"With kindest regards,

"Very truly yours,

/S/ Louis J. Roussel"

Fournet answered in the affirmative and purchased 4,000 shares at $1 per share. Roussel subsequently claimed a long term capital loss of $7,333.33 on the grounds that the stock which he actually sold to Justice Fournet had cost him $11,333.33. The government contends that Roussel merely sold the stock at the same price he had paid for it and therefore realized no loss in the transaction. In the alternative, the government maintains that if the stock sold to Justice Fournet really had cost Roussel $11,333.33, then the difference between the $1 per share which Justice Fournet paid and the stock's market value at the time constitute a non-deductible gift from Roussel to Justice Fournet. This argument is based on the assumption that at the time of the sale to Justice Fournet,

the stock could have been sold for considerably more than $1 per share. We agree with the government's first position.

■ In selling the Universal stock to Justice Fournet at $1 per share, Roussel was merely doing a favor for an old friend. He wanted to enable Justice Fournet to purchase some of the stock at the same low price he had paid. Roussel's letter obviously supports this conclusion, as does his testimony. When asked at his deposition whether the $1 per share was the lowest price the stock had traded for, Roussel, referring to the sale to Justice Fournet, replied, "that is what it cost me and that is what I sold it for . . . ." Having sold the stock for the same price he had paid for it, it is evident that Roussel did not realize any long term capital loss. The IRS properly disallowed the $7,333.33 deduction.

## ISSUE 11

Plaintiff Roussel concedes this issue with respect to the purchase by his son of the branch bank building in the Parkchester Shopping Center.

■ However, the plaintiff does not concede this issue with respect to the purchase by Rena V. Taylor of a service station from Sam Recile on February 8, 1965. According to the government, Taylor received the benefit of a bargain purchase. The government contends that Roussel rendered certain services for Recile, in return for which Recile agreed to sell the service station to Taylor at a bargain price. The government seeks to attribute the amount of the bargain as income to Roussel.

The facts do not support the government's position. Taylor's purchase of the service station was independent of any services Roussel may have performed for Recile. In fact, the transaction was a result of her own dealings with Recile. Moreover, there is insufficient evidence before the Court that in paying $45,000 for the service station

Taylor made a bargain purchase. This transaction, therefore, did not result in any tax consequences for Roussel.

## ISSUE 12

In February 1966 Roussel paid $110,000 to the National American Bank and the bank issued $110,000 worth of its stock to Roussel's son, Louis J. Roussel, III. On February 25, 1966, Roussel's son executed a note in favor of Roussel in the amount of $110,000. The note called for the payment of 2% interest. Soon after this transaction was consummated (before the end of the year), Roussel cancelled the obligation of his son to pay the 2% interest. The $110,000 principal was, however, fully repaid.

The government contends that if the interest obligation was not forgiven before December 31, 1966, then, since Roussel was an accrual basis taxpayer, the interest called for had accrued and should have been reported on Roussel's return. Since the interest was cancelled almost immediately after the note was executed, Roussel properly failed to include it as part of his income for the year.

■ However, the government's alternative position is that by cancelling the interest obligation, Roussel made a gift to his son in the amount of the interest forgiven. We think this contention has merit. In Johnson v. United States, 254 F.Supp. 73 (N.D.Tex.1966), a parent loaned money to his children without charging them interest. The question presented was whether the parent had made gifts to his children in the amount of the interest not charged. The Court found that since the parent had no contractual or statutory duty, express or implied, to charge interest on loans to his children, no gifts could be said to have been made. Here, however, the note clearly provided for the payment of 2% interest. Roussel's son was, therefore, under an express contractual obligation to pay his father the amount called for. Thus, in cancelling this obli-

gation, we find that Roussel made a gift to his son in the amount of the interest forgiven.

## ISSUE 13

In 1966 plaintiff Roussel made the high bid of $2,450,000 for the purchase of the old Federal Reserve Bank building in New Orleans. However, for business reasons, Roussel decided that it would be advantageous for him to consummate the sale and to transact the business of the Federal Reserve building in the name of one of his previously inactive corporations called Business Funds, Inc. Roussel, therefore, advanced his own funds and funds of his other corporations to Business Funds, thereby enabling it to purchase the building on January 28, 1966. Roussel advanced $250,000 to Business Funds, Republic Petroleum advanced $625,000, Empire Land $75,000 and National American Bank, which took a first mortgage on the building, advanced $1,500,-000. On the date of the sale of the building to Business Funds, Roussel executed a counter letter which stated, in essence, that Business Funds was merely the title holder of record and that the property had really been acquired for Roussel's account.

In addition to borrowing money and purchasing the building, Business Funds, Inc., leased the property to various tenants, deposited rental receipts in its own bank account and paid its expenses in its own corporate name. At the end of the year it was determined that the building's expenses had exceeded its rental receipts by $142,451.67. Rather than deduct this operating loss on the tax return of Business Funds, Roussel claimed it on his own on the grounds that as the real owner of the property, he was entitled to the loss deduction and that Business Funds was an inactive shell. The deduction was disallowed by the IRS.

It is clear from the facts surrounding this dispute that Business Funds conducted sufficient business ac-

tivity to be recognized as a separate taxable entity. (Supra, Issue 3). It is apparent that Roussel was careful to provide for the purchase and management of the Federal Reserve building by Business Funds, Inc. Regardless of the technical legal effect of the counter letter insofar as ownership of the property is concerned, Roussel chose to conduct the business of the property through the device of this corporation. Having selected this method to conduct the building's business, Roussel may not now disregard Business Funds as a corporate entity. "[T]he Commissioner, to prevent unfair tax avoidance, has greater freedom to disregard the corporate entity than a taxpayer, who normally cannot be heard to complain that a corporation which he has created, and which has served his purposes well, is a sham." C.I.R. v. State-Adams Corporation, 283 F.2d 395 (2d Cir. 1960). This longstanding principle is not altered, as suggested by Roussel, by the fact that he had "command" over the property in question, rather than Business Funds. Needless to say, those who conduct their affairs through wholly owned corporations always have command over the corporation's property. That has never meant that they could disregard the corporation as a separate tax entity.

Roussel contends, in the alternative, that Treas.Reg. 1.163–1(b) entitled him to deduct $100,793.82 of the $142,451.67 loss which portion comprised the interest expense on the mortgage encumbering the property. That regulation provides in pertinent part that:

> "Interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness . . . ."

Roussel argues that the effect of the counter letter was to give him an equitable interest in the property so that even though he was not directly liable on the

mortgage, the regulation nevertheless entitled him to deduct the interest he paid on the indebtedness.

■ The simple answer to this contention is that from the record it appears that all of the interest payments were made by Business Funds, Inc. Having chosen to channel these monies through Business Funds, Inc., Roussel cannot now claim the deduction for himself. Moreover, there is insufficient evidence in the record for us to conclude that Roussel's personal funds constituted the ultimate source of payment of the interest on the mortgage.

### ISSUE 14

■ For the year 1966, the IRS disallowed a variety of deductions taken by plaintiff, totaling $8,390.31. Roussel concedes the disallowance of all of the deductions save one for a payment of $1,151.25 to Investors Associates, Inc. The money paid for an economic study of a proposed flour mill for Myrtle Grove, Louisiana, on lands in which presumably Roussel or one of his corporations had an interest. Since Roussel failed to show precisely the nature of his interest in the project or the subject matter of the study, we conclude that the deduction was properly disallowed.

### ISSUE 15

In August 1961 plaintiff Roussel purchased 20,000 shares of Universal Drilling Corporation stock for $7.00 per share when its market value was only $2.00 per share. This was done pursuant to an order of the Securities and Exchange Commission directing Roussel to purchase this stock from certain third parties at the price they had paid for the stock. The order was occasioned by the actions of two broke-dealers who had sold the subject stock—there is no suggestion whatsoever that Roussel was at all involved with any of their wrongdoing. The third parties from whom Roussel purchased the stock were neither related to nor associated with him. Furthermore, Roussel derived no benefit from the purchase of the stock at a price $100,000 above its market value.

In December 1961 Roussel sold the stock for its market value, $40,000 ($2.00 per share) and reported a short-term capital loss of $100,000. The IRS disallowed this loss on the grounds that Roussel had improperly claimed the cost basis of the stock to be $140,000. According to the IRS, when one pays more than the fair market value for an asset, if the excess is paid for a purpose other than to acquire the asset, the excess cannot be included as part of the cost basis of the asset. *See* 3A Mertens, Law of Federal Income Taxation, Section 21.-02.

The principle relied upon by the government is a narrow exception to the general rule that the basis of property is the amount paid for it. One of the leading cases in which this exception is explored, Majestic Securities Corp. v. C.I.R., 120 F.2d 12 (8th Cir. 1941), is also the only case relied upon by the government. In that case, the taxpayer corporation had purchased securities from a bank at a price far in excess of their fair market value. Both corporations were owned by the same stockholders. As in the case at bar, the taxpayer then sold the securities at their fair market value and claimed the resulting loss on its tax return. The Commissioner disallowed the loss on the grounds that since the price discrepancy had not been explained by the taxpayer, it would be presumed that the amount paid in excess of the market price was for a purpose other than the acquisition of the stock. This excess, therefore, could not be included as part of the cost of the securities. The Eighth Circuit sustained the Commissioner's finding that the taxpayer had not carried his burden of proving its intent or purpose in paying an amount in excess of the market value for the stock. Therefore, the inference of the Commissioner that the excess was paid not as part of the cost of the stock but instead to improve the financial condition of the bank was reasonable.

In virtually all the cases in which the amount paid for the acquisition of an asset has been held not to constitute its cost, the payment of the excess over market value was designed to benefit, usually economically, either the taxpayer or one of the taxpayer's affiliated corporations. *See e. g.* Transport Manufacturing & Equipment Co. of Del. v. C.I. R., 431 F.2d 729 (8th Cir. 1970); Investors Diversified Services, Inc. v. C.I.R., 325 F.2d 341 (8th Cir. 1963); G.U.R. Co. v. C.I.R., 117 F.2d 187 (7th Cir. 1941); Pennsylvania Indemnity Co. v. C.I.R., 77 F.2d 92 (3rd Cir. 1935). In each of these cases, the amount actually paid to acquire an asset did not constitute the actual cost of the asset to the taxpayer.

▇▇ Here, of course, Roussel's purpose in purchasing securities at a price above their market value has been explained. The expenditure of the excess was certainly not designed to benefit either Roussel or any persons or corporations associated with him. The fact that the price of the stock was set by an arm of the government does not mean that the excess above market value paid for something other than the stock. The entire amount spent by Roussel paid for the stock only and, hence, constituted the cost of the stock to Roussel. He could not have purchased the stock at a lower cost to him even if he had been so inclined. We, therefore, conclude that the government erred in disallowing the taxpayer's $100,000 short-term capital loss.

## ISSUE 16

At a special meeting of the Board of Directors of Republic Petroleum Corporation held on July 14, 1960, the Board, by resolution, authorized a $55,000 payment to Louis J. Roussel, the president of the corporation, "in full settlement of all and whatever claims he had or may have for any and all expenditures he may have made, directly or indirectly, for and on behalf of this corporation and its shareholders in connection with the leasehold interest owned by this corporation and the royalty interests owned by its shareholders in Section 40, Township 14 South, Range 20 East, St. Charles Parish, Louisiana." The minutes reflect that Roussel had reported to the Board that the payment was made to reimburse him for "expenses incurred and advanced by him" with regard to the approximately seventeen years of litigation concerning the property in question. According to the minutes, Roussel had reported that he had made such advances known to the Board at a meeting held in 1958, but had not requested payment at that time because corporate funds were then needed for the development of the property. It is undisputed that the litigation terminated in a judicial decision establishing Republic's interest in the mineral lease as a result of which Republic has received more than one million dollars in payments under the lease. Republic's business expense deduction for the payment to Roussel was disallowed by the IRS on the grounds of lack of substantiation. In its claim for refund and at trial, Republic contended that despite the clear meaning of the July 1960 corporate resolution, the payment to Roussel was intended in whole or in part to compensate him for services rendered with respect to the seventeen year litigation.

▇▇ Republic, of course, bears the burden of proving by clear and convincing evidence that it is entitled to the claimed deduction. Moreover, where, as here, a corporation makes a large payment to one of its officers who is also the controlling stockholder of the corporation, the transaction deserves close judicial scrutiny.

▇▇ The first question which must be resolved is what was the purpose of the payment to Roussel? Since the payment had to be authorized by the Board of Directors, we naturally turn to them for guidance. The best evidence of their intentions is, naturally, the corporate resolution authorizing the expenditure which clearly states that the

payment was "ratified, approved and confirmed" as a reimbursement for Roussel's expenses and advances. We believe that Republic is bound by the description of the payment made by its own Board in the corporate resolution authorizing the expenditure. The deduction must rise or fall on that basis. Since no evidence was offered to show the amount of money actually expended or advanced by Roussel in connection with the mineral lease litigation, we conclude that the deduction was properly disallowed.

Moreover, even if we were inclined to permit Republic to substantiate the deduction as a payment for services rendered, we note that the taxpayer has failed to carry its heavy burden of proof. The only evidence introduced pertaining to the nature of the services rendered consisted of the testimony of Roussel and Margaret Lauer, both of whom stated in general terms that Roussel had done a considerable amount of work on the lawsuit including some investigating and travelling. No evidence was introduced, however, upon which the Court could make a finding that the $55,000 payment was either ordinary, necessary or reasonable in amount; that is, evidence of the specific nature of the services rendered, the amount of time spent working on the litigation, the reasonableness of the compensation paid for such work, and other obviously important factors.

In the absence of such detailed and concrete evidence, especially when the transaction in question must be closely scrutinized, the claimed deduction must be disallowed.

### ISSUE 18

On August 25, 1966, plaintiff Roussel purchased two squares of property on Canal Street in New Orleans, known as Squares 187 and 188, for a total price of $4,750,000 from the Ford Leasing Development Company and at the same time signed a mortgage agreement with the vendor for $4,250,000. Title to the property was recorded in the name of Louis J. Roussel. On August 26, 1966, the Board of Directors of Republic held a special meeting at which they explicitly acknowledged that Square 187 had been purchased for its own account but that for reasons of practicality title would be held by Roussel. By corporate resolution, F. D. V. de La Barre, the president of Republic, was "authorized, empowered and instructed to acquire the said property in the name of Louis J. Roussel . . . ." At approximately the same time, a counter letter was executed between Roussel and Republic which fully reflected the board's resolution. It reads as follows:

> "I have this day taken title to two squares of land on Canal Street (Numbers 188 and 187) by Act before Charles E. Richards, Jr., for the price of $4,750,000.

> "This will confirm our understanding and agreement that Square 187, bounded by Canal, North Robertson, Iberville and North Villere, is actually being purchased by me for your account, and will be held in my name for you, to be transferred to you when you so request. The price is one-half of the total of $4,750,000 or $2,375,000. Your responsibility to pay said price is at the same time and under the same conditions as recited in said sale (copy of which is attached hereto and made a part hereof), to the extent of one-half of the recited price and interest expense.

> "Please acknowledge by signing hereinbelow.

> > "Very truly yours,
> > /S/ Louis J. Roussel"

"August 26, 1966

"We hereby approve and confirm the foregoing understanding and agreement.

"REPUBLIC PETROLEUM CORPORATION

By /S/ F. D. V. de La Barre
 President"

This counter letter was never recorded nor filed in the conveyance records. The corporation then proceeded to reimburse Roussel for the interest on the mortgage obligation attributable to Square 187 pursuant to the counter letter and claimed an interest deduction in 1966 for the amounts so paid. The IRS disallowed this $43,184 reduction, arguing that an interest deduction is allowable only if the underlying indebtedness is that of the taxpayer. The government contended that since the obligation to make the interest payments on the mortgage was that of Roussel, only he could take advantage of the interest deduction. In the government's view, the corporation was merely paying the interest on the indebtedness of one of its shareholders. The sums received by Roussel were, therefore, constructive dividends which would be offset by a corresponding interest deduction. To give effect to the counter letter and permit Republic to take the interest deduction would, according to the government, allow Roussel to decide at the end of the year whether he or Republic would benefit most from the deduction and claim it accordingly.

■■ We certainly cannot quarrel with the government's assertion that generally an interest deduction cannot be taken unless the interest was owed on an indebtedness of the taxpayer. Nelson v. C.I.R., 281 F.2d 1, 5 (5th Cir. 1960); Guardian Investment Corp. v. Phinney, 253 F.2d 326 (5th Cir. 1958); 4A Mertens, Law of Federal Income Taxation, § 26.03. But the government's interpretation of the applicable law wholly fails to come to grips with the provisions of Treasury Regulation 1.163–1(b) which provides in pertinent part:

> "Interest paid by a taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness . . . . ."

In support of its position that the indebtedness must be a direct obligation of the taxpayer, the government cites Guardian Investment Corporation v. Phinney, 253 F.2d 326 (5th Cir. 1958). In that opinion, however, the court had occasion to interpret the regulation in question. The court stated, at 332:

> "The object of the Regulation is to relax the general rule that interest is not deductible unless it is paid on an obligation *of the taxpayer*. The Regulation relaxes the rule by recognizing 'equitable liability' on the part of a taxpayer who may be secondarily or indirectly liable." (emphasis added)

It would seem, therefore, that interest is properly deductible by a taxpayer as long as he is "under an equitable liability to pay it as having received, in substance, the benefit of the indebtedness." 4A Mertens, Law of Federal Income Taxation, § 26.03. Thus, the question we must resolve is whether Republic was under such an equitable liability to pay the interest. The answer necessarily hinges upon the effect under Louisiana law of the counter letter executed by Roussel and Republic.

■■ Of primary interest in resolving this problem is LSA–C.C. Art. 2239 which provides in pertinent part:

> "Counter letters can have no effect against creditors or *bona fide* purchasers; they are valid as to all others; . . . . ."

Similarly, LSA–R.S. 9:2721 provides that:

> "No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records

shall be binding on or affect such third parties."

While the technical definition of a counter letter is "an agreement to reconvey where property has been passed by absolute deed with the intention that it shall serve as security only," Karcher v. Karcher, 138 La. 288, 70 So. 228, 229 (1915), Louisiana courts have, on many occasions enforced counter letters or similar agreements, such as the one here at issue, in which the purchaser of real property discloses that he purchases not for himself but on behalf of the true owner. So long as uninfluenced by fraud or duress or the product of error, the principal is well established that such secret, unrecorded agreements are binding and enforceable upon the parties to them. *See, e. g.,* Safford v. Ellish, 276 So.2d 884 (La.App.1973) ; Cavallino v. Cavallino, 231 So.2d 623 (La.App. 1970) ; Charles Tolmas, Inc. v. Bressler, 231 La. 1, 90 So.2d 55 (1956) ; Standard Oil Co. of Louisiana v. Futral, 204 La. 215, 15 So.2d 65 (1943) ; Scurto v. LeBlanc, 191 La. 136, 184 So. 567 (1938). In the case at bar, the intentions of the parties are clearly expressed in the corporate resolution and the counter letter, that is, that the real purchaser of Square 187 was Republic who agreed to pay the entire purchase price including interest on the mortgage. Under Louisiana law, then, Republic, though not the title owner of record, may nonetheless be regarded as the equitable owner of Square 187 by virtue of the counter letter, and as such, indirectly obligated to make the payments in dispute.

■ The government cites Marcello v. C. I. R., 380 F.2d 499 (5th Cir. 1967), for the proposition that the tax laws do not permit a taxpayer to use affidavits or counter letters to show that he owns real property, though legal title is in another. In that case, a residence was purchased in the name of the taxpayer's mother. An affidavit was produced reciting that the property was put in the mother's name for convenience only and that it had really been purchased by and

for the account of the taxpayer. Subsequently, the taxpayer attempted to take advantage of the provisions of Section 1034(a) of the Internal Revenue Code which provides that if within a year before or after the sale of a taxpayer's residence, the taxpayer purchases and uses a new residence, the gain on the sale of the old residence to the extent of the cost of purchasing the new residence is not recognized. The court held that regardless of the effect of the affidavit under . state law, taxpayer's mother owned and used the property as her residence. Since the taxpayer had neither purchased or used the property as his new residence, he could not postpone recognition of gain on the sale of his old residence. In the case at bar, we have no quarrel with the government's assertion that Roussel is the "legal" owner of Square 187 and is personally and directly obligated to pay the interest on the mortgage. But Treasury Regulation 1.-163–1(b) permits "equitable" owners to deduct interest payments they make on mortgages upon their real estate, even if they are not directly liable on the note.

Finally, the government argues that if Republic is permitted to take the interest deduction in question, Roussel would be able to decide at the end of the year whether he or his corporation would benefit most from the deduction and claim it accordingly. We note first that even the government concedes that the choice of the method which Roussel used to effect the purchase of Square 187 was not dictated by reasons of tax avoidance, but by business considerations. For example, by taking Square 187 in his own name, Roussel avoided the necessity of a credit check on Republic which could have caused delays in consummating the transaction. Furthermore, we do not believe that Roussel could manipulate the interest deduction as envisioned by the government. The interest payments which Roussel made were paid on a quarterly basis. As payments were made, Roussel received checks from Republic to reimburse him for the amounts

attributable to Square 187. If Roussel decided at the end of the year that he would benefit most from the interest deduction, and then claimed the deduction on his return, the payments received from Republic would, we think, have to be included as part of his income. The deduction and the added income would cancel each other out, with no resulting tax benefit to Roussel. The government's fears, thus, do not seem well founded.

## ISSUE 19

The government disallowed certain business deductions taken by the plaintiff corporation on the grounds of lack of substantiation. Republic has conceded that it failed to prove that it was entitled to deduct as business expenses certain miscellaneous payments made to Robert H. Brothers and to Ernest Wright totaling less than $1,000. We find that an additional $750 payment to Robert H. Brothers was made to reimburse him for lobbying expenses incurred on behalf of Republic and was, therefore, properly deductible.

The next item concerned a payment of $1,461.31 to Honorable James H. Morrison who was, at the time, a member of the House of Representatives. The taxpayer clearly proved that this money paid for information pertaining to proposed legislation potentially affecting taxpayer's business which Representative Morrison obtained from the House Recording Studios. Though the check was payable to Representative Morrison, the endorsement reflected that it was deposited to the Treasury of the United States, House Recording Studios.

Finally, we consider five deductions taken by Republic for expenses incurred with respect to its purchase and sale of a large block of the stock of the Quaker State Oil Company. In 1964, Republic purchased 59,600 shares of Quaker State for $2,742,932.42. It then sold the stock approximately four months later, realizing a gain of $743,667.58. Republic took deductions for five payments it made to-

taling $65,000 which it claims constituted costs of effecting the transaction, and, as such, ordinary and necessary business expenses. The first, in the amount of $25,000, was paid to the Universal Drilling Company. This money was paid according to Roussel as a "loan fee" or "bonus" for a $1,000,000 loan used by Republic to acquire the Quaker State Oil stock. In addition, Republic paid $5,000 to three individuals, Francis LeJeune, John Hartman and Meyer Barton, allegedly for guaranteeing certain unspecified loans made to finance the purchase of the stock. Finally, Republic paid $25,000 to Roussel, allegedly for services rendered and expenses incurred in connection with arranging the purchase and sale of the stock.

The taxpayer, of course, bears the burden of proving by clear and convincing evidence that it is entitled to the claimed deductions. This entails proving not only that the payments were made in furtherance of the corporation's business but also that they were ordinary, necessary and reasonable in amount. A review of the evidence convinces the Court that this heavy burden has not been met with respect to the five Quaker State Oil payments. The only concrete documentary evidence before us are the vouchers for the disputed checks. The vouchers for the checks issued to Universal Drilling, LeJeune, Hartman and Barton all bear the notation "for services rendered." The voucher for the check issued to Roussel states that it was for services rendered and expenses incurred in relation to the Quaker State Oil stock deal. The only other evidence concerning the five payments consisted of the testimony of Roussel, LeJeune and Hartman. Roussel stated that the payments were made for the reasons outlined above. LeJeune testified he was paid $5,000 for guaranteeing the payment of certain funds borrowed by the taxpayer to acquire the Quaker State Oil stock. Barton, a C.P. A., testified that he received $5,000 for professional services rendered in connec-

tion with the deal. In addition, he thought that he had probably guaranteed some portion of the taxpayer's loans.

The taxpayer's evidence consists solely, then, of the oral testimony of Roussel and two of the check recipients which we find to be largely general and conclusory in nature. The record is completely devoid of any other evidence pertaining to the details of the underlying transactions. Since we know nothing about the terms of the $1,000,000 loan agreement between Republic and Universal Drilling, or the reasons a loan bonus was paid, there is no evidence upon which we can find that the alleged $25,000 loan bonus was either ordinary, necessary or reasonable in amount. Similarly, taxpayer's failure to introduce any evidence pertaining to the details of the alleged loan guarantees leaves us in the dark as to how much each individual undertook to guarantee or under what terms or why guarantees were necessary. If part of the money paid to Barton or Hartman was for accounting services rendered, the taxpayer failed to prove specifically what work was done and under what terms. Finally, Roussel failed to document any of his own expenses incurred in arranging for the stock deal or to prove the reasonableness of his compensation. We, therefore, find that the taxpayer's evidence is wholly inadequate to substantiate its claim that the five expenditures in question were either ordinary, necessary or reasonable in amount.

### ISSUE 20

Due to the lawsuit concerning title to the Bollinger-Melancon lease (see Issue 26), income otherwise receivable by the plaintiff corporation under this disputed lease for the years 1959–1962 and part of 1963 was deposited in an escrow account. In 1963 the escrowed lease proceeds were paid to Republic. In the same year, Republic also received certain unitization payments for prior years' production which had likewise been escrowed because of the litigation. Both parties agree that the escrowed amounts received by Republic in 1963, though attributable to production under the lease for prior years, was properly reportable in 1963 as income realized in that year.

■ The dispute concerns the deduction taken by Republic for depletion in 1963. During the years in which the lease proceeds were escrowed, Republic took cost depletion deductions on operations under the disputed lease. In 1963, Republic took a percentage deduction for depletion calculated on its gross income from the lease for that year. Since its gross income included all of the escrowed amounts received in 1963, it is evident that Republic, in effect, took a double deduction for depletion for the same production, once based on cost and once based on a percentage. The IRS, therefore, properly adjusted the plaintiff corporation's 1963 depletion deduction to eliminate this double benefit.

### ISSUE 21

■ The question involved in this issue is whether, for purposes of calculating depletion, wet gas should be valued at the wellhead prior to its separation into natural gas and liquid hydrocarbons through processing, rather than valued at the increased sale price occasioned by the separation process. The IRS reduced the depletion deduction taken by the plaintiff corporation for the years 1963–1966 on the grounds that the taxpayer had erroneously calculated the value of the gas at its post-processing sales price.

The value of the wet gas can be determined before the processing, though it must be an average value because of the lack of uniformity of the wetness and dryness of the gas. The processing adds value to the liquids that are extracted, but does not add value to the gas. The drier the gas, the less combustible it is, and, consequently, the less value it has. The gas that remains after the processing is equal to approximately 98 to 99

per cent of its original value. And, the extracted liquid hydrocarbons also have value.

It would be possible to sell the wet gas without running it through the absorption process, but that is not done because more income can be derived by selling the processed drier gas and the liquid hydrocarbons that have been extracted from it by virtue of the processing.

Plaintiff corporation took its depletion allowance not on the value of the wet gas at the wellhead, but on the value of the processed drier gas and the value of the liquid hydrocarbons removed therefrom. The Internal Revenue Service adjusted plaintiff corporation's percentage depletion downward by disallowing the portion of the depletion taken on the increased value of the liquid products after the processing.

This action taken by the government was correct. Although the absorption process is essential from a marketing viewpoint, it is not essential to production. Since this processing represents a "processing or manufacturing" activity not necessary to the "production" of the natural gas, any added value to the gas caused by the processing may not be included in the value of the gas for depletion allowance purposes. Shamrock Oil & Gas Corp. v. C. I. R., 346 F.2d 377 (5th Cir. 1965).

## ISSUE 22

For the years 1964, 1965 and 1966, the taxable income of the plaintiff corporation was increased by the IRS by allocating to it interest at the rate of 5% per annum upon advances it made to Superfine Oil & Gas Company, Inc. The interest free advances, totaling more than $200,000 were made to enable Superfine to develop certain mineral leases in Texas. The plaintiff corporation owned 75% of the working interest in the leases and Superfine owned the remaining 25%. Both corporations were controlled by plaintiff Roussel. The allocation of interest income was made by

the Commissioner so as to reflect an arm's-length transaction pursuant to the provisions of Section 482 of the Internal Revenue Code of 1954 and the Treasury Regulations promulgated thereunder. While initially the plaintiff corporation maintained that the action of the Commissioner was erroneous, its post-trial memoranda submitted to the Court make it clear that it has now acquiesced.

The government, of course, initially defended the action of the Commissioner. However, it now contends that the advances were not loans, but were contributions to Superfine's capital, and, therefore, were in reality constructive dividends to Superfine's owner, plaintiff Roussel. This claim, in the nature of a set-off, seems clearly inconsistent with the position of the Commissioner and was only raised for the first time in the pre-trial order. At trial, the government filed an answer to the plaintiff's amended complaint in which it formally asserted the "set-off," though the amended complaint did not concern the transaction in question. While we are aware of the broad rights of the government to assert defenses of recoupment and set-off, we question the fairness of the manner in which the new claim was raised in this case. Though the taxpayer objected at trial to the introduction of evidence pertaining to the claimed set-off, it now waives its objection and urges that the Court dispose of this issue. We, therefore, will consider the merits of the government's claim for a set-off.

At the time of the transaction at issue, plaintiff Roussel owned approximately 80% of the shares of the plaintiff corporation. He also owned 34% of the stock of Superfine, with his son and daughter each owning 33⅓% of its stock. The government's position seems to be grounded in a belief that where a taxpayer controls two corporations, any transfer of funds from one to the other may be characterized as a constructive dividend to the taxpayer. Accordingly, the government seeks to assess taxes

against Roussel on the approximately $200,000 advanced to Superfine. Of course, even if the government's theory is correct, it would seem that Roussel's income could only be increased by an amount proportionate to the percentage of his ownership in Superfine. At any rate, we do not believe that any of the money in question may be characterized as a constructive dividend to Roussel. The money was not advanced or distributed to him, but to Superfine, for the development of mineral leases owned jointly by Republic and Superfine.

■ The government has failed to propose any reasons why we should disregard Superfine as a corporate entity by treating funds it received as a constructive dividend of one of its owners. The cases relied on by the government do not support its position. In both General Aggregates Corporation v. C. I. R., 313 F.2d 25 (1st Cir. 1963), and Limericks, Inc. v. C.I.R., 165 F.2d 483 (5th Cir. 1948), corporate funds paid to a stockholder, as a loan in the former case and as rent in the latter, were held to be, in reality, a distribution of profits and, therefore, a constructive dividend. Here, the corporate funds in question were paid not to one of Republic's stockholders, but to the corporation itself. We think the Commissioner made a proper disposition of the transaction by allocating interest income to Republic so as to reflect an arm's-length loan to Superfine. Of course, Superfine may be entitled to correlative adjustment pursuant to Treasury Regulation § 1.482(d) (2).

## ISSUE 26

The question presented in this issue is whether attorney's fees and litigation expenses incurred by the plaintiff corporation in defense of a state court lawsuit were properly deducted as business expenses pursuant to 26 U.S.C. § 162(a) or whether they must be capitalized. The government disallowed the deductions on the grounds that the expenditures constituted part of the cost of defending the taxpayer's title to property, and that, as such, they had to be capitalized pursuant to 26 C.F.R. 1.263(a)–2(c).

The facts and issues involved in the state court litigation entitled Bollinger v. Republic Petroleum Corporation are detailed by the First Circuit Court of Appeal of Louisiana at 194 So.2d 139 (1966). Briefly stated, the suit was an attempt to cancel a mineral lease due to the failure of Republic as lessee to pay shut-in gas royalties as called for by the lease. In defending this litigation, it is clear that the plaintiff corporation was essentially defending its interest in or title to the disputed lease. Republic sought to prevent the termination of its leasehold interest by contending that the lease had not been violated. The district judge ruled that "the lease will be cancelled in entirety" due to the failure of Republic to pay the shut-in royalties. This ruling was overturned by the circuit court which found that the plaintiffs had neglected to comply with certain notice provisions in the lease.

■ Expenditures made in defense or perfection of title are, of course, capital items and are not deductible as expenses from gross income. Woodward v. Commissioner, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970). This rule has been applied where the property concerned consists of leasehold interests. Industrial Aggregate Company v. United States, 284 F.2d 639 (8th Cir. 1960); Bush Terminal Bldgs. Co. v. C.I.R., 204 F.2d 575, 578 (2d Cir. 1953). However, the mere fact that title to property happens to be involved in litigation does not necessarily mean that the expenses incurred in furtherance of that litigation are rendered non-deductible. In an attempt to "draw the line," various standards have been established including the "primary purpose" and the "origin of the claim" tests. It is evident to us that, regardless of which test is applied, the answer is clear. Republic's expenditures were made to defend its title to the disputed lease. A defeat

in the suit would have necessarily resulted in the cancellation of its mineral lease, a valuable capital asset. Republic was not primarily defending itself against a large claim for damages, as in *Industrial Aggregate Company, supra,* nor against a claim for an accounting of royalties, as in Morgan's Estate v. C. I. R., 332 F.2d 144 (5th Cir. 1964). Republic was simply involved in defending its right or title to a capital asset. Litigation expenditures made in that regard must, therefore, be capitalized.

## ISSUE 27

The plaintiff corporation's proposed findings of fact and conclusions of law make it clear that it has acquiesced in the allocation by the IRS of a value of $8,200 to the Hardin mineral interest rather than the $15,000 value originally claimed by the corporation.

## SALE OF UNIVERSAL DRILL-ING COMPANY STOCK

For the years 1960 and 1962, the IRS disallowed capital losses claimed by plaintiff Roussel resulting from his sale of Universal Drilling Company stock. For the reasons detailed in Issue 15, we find this action of the IRS to be erroneous. The taxpayer is entitled to the full amount of his claimed capital losses resulting from the sale of the subject stock.

## *BAD DEBTS*

■ For the year 1962, the IRS disallowed several nonbusiness bad debts claimed by plaintiff. We find that the debts owed by Mrs. Reed, Mrs. Lovell and Mr. Lambert were uncollectible and properly written off by the taxpayer.

■ However, we conclude that the IRS properly disallowed the deduction taken for a bad debt with reference to the stock subscriptions of Universal Drilling Company, Inc. The only properly deductible bad debts were those of the various subscribers who failed to pay Universal for their stock subscriptions. These subscribers were not in-

debted to the taxpayer, but to the corporation. The taxpayer appears to have loaned money to the corporation to enable it to pay for the stock subscriptions, but there is no evidence that this debt constituted a deductible "bad debt."

Finally, we note that the taxpayer has conceded that the debt owed by Mr. Wright was not worthless and was, hence, improperly deducted.