ROGER M. ELLISON AND ROSEMARY J. ELLISON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 14449–81, 14450–81, 14770–81, 16211–81, 16319–81, 17552–81.     Filed February 14, 1983.

*J. Gordon Hansen, John M. Bradley, Stuart A. Fredman,* and *Frederick S. Prince, Jr.,* for the petitioners.
*Richard W. Kennedy,* for the respondent.

OPINION

FEATHERSTON, *Judge*: Respondent determined that petitioners in these consolidated cases were liable for deficiencies in their Federal income taxes as follows:

| Petitioners | Taxable year | Deficiency |
|---|---|---|
| Roger M. Ellison and Rosemary J. Ellison | 1977 | $10,504.00 |
| Ross Rudolph and Nancy T. Rudolph | 1977 | 1,655.00 |
| | 1978 | 6,110.00 |

[1]Cases of the following petitioners are consolidated herewith: Ross Rudolph and Nancy T. Rudolph, docket No. 14450–81; Steven F. Lowe and Ruth W. Lowe, docket No. 14770–81; Vincent E. Webb and Carol A. Webb, docket No. 16211–81; Robert M. Elder and Irene B. Elder, docket No. 16319–81; and Stanley F. Handel and Carolyn H. Handel, docket No. 17552–81.

| | | |
|---|---|---|
| Steven F. Lowe and Ruth W. Lowe .................. 1977 | | 1,127.00 |
| Vincent E. Webb and Carol A. Webb ............... 1977 | | 3,394.00 |
| Robert M. Elder and Irene B. Elder ................. 1977 | | 12,279.38 |
| Stanley F. Handel and Carolyn H. Handel ......... 1975 | | 12,894.33 |
| | 1976 | 16,027.87 |
| | 1977 | 26,224.11 |

After concessions by the parties, the only issue remaining for decision is whether certain rental income produced by two apartment complexes purchased by partnerships of which petitioners were members is taxable to petitioners or to the sellers of the complexes.

All the facts are stipulated.

Petitioners in these cases are six married couples. At the time of filing their petitions, petitioners were legal residents of the following cities:

| Petitioners | City of residence |
|---|---|
| Ellison ...................... | Sandy, Utah |
| Rudolph .................... | La Jolla, Calif. |
| Lowe ........................ | Salt Lake City, Utah |
| Webb ........................ | Salt Lake. City, Utah |
| Elder ........................ | Palos Verdes Estates, Calif. |
| Handel ...................... | Bellaire, Tex. |

Petitioner-husbands were limited partners in either of two real estate partnerships described below. Petitioner-wives are parties to this case only because they filed joint Federal income tax returns with their husbands or held interests in the property in question under State community property laws.

Both of the partnerships in which petitioner-husbands were partners were formed by Clark Financial Corp. (CFC). One of the partnerships, named CFC—77 Partnership A (CFC—77A), was formed to invest in an apartment complex named Town Park. The other partnership, named CFC—77 Partnership C (CFC—77C), was formed to invest in an apartment complex named Villa del Rey. Both of the apartment complexes were located in Houston, Tex. At all times relevant to the instant cases, both CFC—77A and CFC—77C, and all of their limited partners, computed their taxable income according to the cash method of accounting and used the calendar year as their taxable year.

CFC—77A purchased Town Park by agreement dated July 1, 1977,[2] from REICA Properties, a California limited partnership. The sales agreement provided for a stated purchase price of $5,250,000. It also provided for "other payments to seller" in the total amount of $650,000, composed of a payment of $500,000 as consideration for the seller's covenant not to compete, a payment of $50,000 for the seller's management advice during the period of transition, and a financing fee of $100,000. In addition, the seller was to receive the first $500,000 of rents collected by CFC—77A after the sale. This condition of the sale was stated in a description of the property which was attached to the sales agreement and incorporated in it by reference and is as follows:

Reserving unto the Grantor an interest in the subject property in the form of a *Profit*, a *Rendre* or fee rent or rent seck or rent resolute attaching to the first $500,000.00 of rents, issues and profits from the subject property from and after June 30, 1977 such that the first $500,000.00 of such rents, issues and profits are not received by Grantee but are taken in trust by Grantee for the payment over to Grantor of $500,000.00, in all events on or before December 15, 1977. The reservation contained in this paragraph shall unconditionally and for all purposes terminate, extinguish and expire and no longer be a burden on the subject property on April 1, 1978.

The negotiations leading up to the sale were described in a prospectus compiled by CFC for potential investors. CFC's negotiations with Jeffere Van Liew, one of the general partners of the seller, REICA, were described in the prospectus as follows:

When we decided to go ahead and buy the property in June 1977, we went to San Diego and presented our offer to Mr. Van Liew. He would not budge on the price so we ended up paying full price for the property at $6,300,000. In addition, so that we could "split-fund" the down payment, (pay $500,000 down at closing and $1,500,000 at the end of the year), he insisted on an additional $100,000. We ended up paying him Total Considerations of $6,400,000. However, we were successful in getting him to take $1,150,000 in "Soft Dollars" on the transaction so that more than offset the extra $100,000 of purchase price.

---

[2] The sale was not actually closed until Aug. 31, 1977. The sales agreement provided that the closing would be held "on or about July 31, 1977," and that, at the closing, the parties would "execute and deliver such documents as are required by this agreement to shift to Buyer the benefits and obligations of ownership * * * as of July 1, 1977." At the closing, the seller was reimbursed by CFC—77A for its operating expenses subsequent to July 1, 1977, and in its Partnership Return of Income for 1977, CFC—77A claimed depreciation on Town Park as of July 1, 1977.

The prospectus explained that "'Soft Dollars' [consisting of the $500,000 for the covenant not to compete, $50,000 for management advice, $100,000 as the financing fee, and $500,000 as 'reserved' rent] are deductible to us and ordinary income to the seller." The prospectus contained the following breakdown of the "total consideration" being exchanged for the property:

| | |
|---|---:|
| Purchase price | $5,250,000 |
| Covenant not to compete | 500,000 |
| Management fee to seller | 50,000 |
| Financing fee to seller | 100,000 |
| Rent a rendre to seller[1] | 500,000 |
| Total consideration | 6,400,000 |

[1] The "rent a rendre to seller" was described elsewhere in the prospectus as follows:

RENT RETENTION BY SELLER

As Buyer, we have agreed as a part of the consideration hereunder to grant a Rental Retention Interest to the Seller of $83,333 per month for the six months of July to December 1977. The total Rental Retention then is $500,000 which will be picked up by the Seller as ordinary income and will not be income to the Buyer.

This description is slightly at variance with the actual agreement insofar as it represents that the rentals retained by the seller were limited to $83,333 per month. The actual agreement, quoted above, provided for the retention by the seller of the first $500,000 of rents, with no limit on the amount retained in any particular month before the total was reached.

The prospectus also contained the following breakdown of the "split-funded" downpayment referred to in the passage quoted above:

Payments to be made in 1977

| | | |
|---|---|---:|
| July 1977 | Principal payment | $500,000 |
| Nov. 1, 1977 | Principal payment | 350,000 |
| | Covenant | 500,000 |
| | Management fee | 50,000 |
| | Financing fee | 100,000 |
| | Rent a rendre | 500,000 |
| Total payments | | 2,000,000 |

In a schedule included in the prospectus and entitled "1977 Summary Pro Forma of Annualized Income, Expenses and Cash Flow (Worst Case Projection)," CFC indicated that monthly gross rentals for Town Park were expected to exceed $87,000, and annual gross rentals to exceed $1 million. The "vacancy factor" was estimated to be 4 percent. These estimates were based on REICA's actual operating results.

Pursuant to a separate written agreement between CFC—77A and an affiliate of REICA, the affiliate managed Town Park for CFC—77A from July 1, 1977, until November 1, 1977. The affiliate was paid by CFC—77A for its services. During that period, all gross rentals collected were retained by REICA. When CFC—77A took over the management of the complex on November 1, 1977, the first rentals it collected were held in trust for REICA until the total amount of those rentals and the rentals retained by the affiliate of REICA during the preceding period reached an aggregate of $500,000. The total of $500,000 thus collected was received by REICA on or before December 15, 1977. At no time following the acquisition of Town Park did either REICA or CFC—77A treat the rentals as anything but the property of REICA until REICA had received the first $500,000 of such rentals.

The purchase of Villa del Rey by CFC—77C closely paralleled the purchase of Town Park by CFC—77A. CFC—77C purchased Villa del Rey by agreement dated November 3, 1977.[3] The seller was Villa del Rey No. Two, Ltd., a Texas limited partnership. The stated purchase price was $10,168,000. In addition, the seller was to receive $150,000 of the rents collected by CFC—77C after the sale, composed of the first $50,000 of rents collected for each of the months of November and December 1977, and January 1978. This condition was stated in the following paragraph of the description of the property contained in the agreement.

Reserving unto the Grantor and heretofore transferred by Grantor to Windsor Properties, Inc., a California corporation, an interest in the subject property in the form of a reditus siccus attaching to $150,000.00 of the rents, issues and profits from the subject property from and after November 1, 1977 such that the first $50,000 of rents, issues and profits from the months of November and December 1977 and from January 1978 are not received by Grantee but are taken in trust by Grantee for the payment over to the assignee of Grantor in all events on or before the fifteenth day of each such month. The reservation contained in this paragraph shall unconditionally

---

[3]The closing was held on Dec. 20, 1977. The sales agreement provided that the closing would be held on or before Dec. 31, 1977, but that the buyer, CFC—77C, would "succeed to the benefits and obligations of ownership" as of Nov. 1, 1977. In the closing statement CFC—77C was charged with real property taxes accruing after Nov. 1, 1977, and in its Partnership Return of Income for 1977, CFC—77C claimed depreciation on Villa del Rey as of Nov. 1, 1977.

and for all purposes terminate, extinguish and expire and no longer be a burden on the subject property on April 1, 1978.

Villa del Rey was managed by an affiliate of the seller, Villa del Rey No. Two, Ltd., through December 27, 1977, pursuant to a separate written agreement with CFC—77C. The affiliate was compensated by CFC—77C for its services. During that period, gross rentals were retained by the seller. After December 27, 1977, an affiliate of CFC—77C took over the management of the complex. It held the first rentals it collected in trust for payment to an assignee of the seller. As a result of these events, an aggregate of $150,000 in rentals was disbursed to the seller, or its assignee, by the end of January 1978.

As in the case of Town Park, CFC prepared a prospectus for potential investors in Villa del Rey. In the prospectus, the $150,000 of rent retained by the seller was described as part of the "total consideration" paid for the property. The prospectus contained a schedule entitled "Summary Pro Forma of Annualized Income, Expenses and Cash Flow" in which it was estimated, based on the seller's actual operating results, that monthly rentals would exceed $150,000. Vacancies were estimated to be 4 percent.

Respondent maintains that the amounts of $500,000 and $150,000 of rental income reserved to the sellers of Town Park and Villa del Rey, respectively, are taxable to petitioners because their partnerships were owners of the properties when that income was produced. We hold for respondent. We think that the facts set forth above compel the conclusion that the payments made to the sellers of the two apartment complexes under the rent retention clauses were, in substance, deferred payments of the purchase prices of the complexes. Because those payments inured to the benefit of the partnerships, they are taxable to petitioners as their respective shares of the partnership income under section 702(a).[4]

The issue is one of substance versus form. True, the deeds to petitioners' partnerships in form "reserved" the rents here in dispute to the sellers of the apartment complexes. But when

---

[4]All section references are to the Internal Revenue Code of 1954 as in effect during the tax years in issue, unless otherwise noted.

that form is peeled away, it becomes apparent that, in substance, the reserved rents were earned by petitioners and were used to pay part of the consideration for the purchases.

After the purchases of the apartment complexes were closed, the partnerships, CFC—77A and CFC—77C, owned, and, through their agents, managed and operated the property that produced the "reserved" rental income.[5] As noted in notes 2 & 3 *supra*, the benefits and obligations of the ownership of Town Park passed to CFC—77A as of July 1, 1977, and the benefits and obligations of the ownership of Villa del Rey passed to CFC—77C as of November 1, 1977. The buyer-partnerships thus furnished both the capital and the labor from which the reserved rents were derived.[6] The sellers' rights to the "reserved" rents contributed nothing to the production of those rents.

Town Park produced the disputed $500,000 in rental income on or before December 15, 1977, within less than 5½ months after the transfer; Villa del Rey produced the $150,000 in rental income within 3 months after the transfer. The record shows that the parties anticipated that rents in those amounts would be produced within a very short period; at the time of the respective sales, Town Park was rented at 96 percent of capacity and Villa del Rey at 97.5 percent. In fact, the clause reserving rents in the CFC—77C purchase agreement, quoted above, states on its face that the reserved rents were to consist of the first $50,000 of rents for each of the months of November and December 1977, and January 1978. Given the short periods within which the parties expected the specific amounts of reserved rents to be paid, the only reasonable

---

[5]The parties have stipulated that, pursuant to a separate written agreement, CFC—77A agreed with an affiliate of REICA (the seller) that the affiliate "would manage the Apartment Complex for or on behalf of" CFC—77A and that the affiliate managed Town Park for CFC—77A beginning July 1, 1977. An affiliate of CFC—77C likewise managed Villa del Rey "on behalf of" CFC—77C.

[6]In *Eisner v. McComber*, 252 U.S. 189, 207 (1920), the Supreme Court gave the classic definition of income: "'Income may be defined as the gain derived from capital, from labor, or from both combined', provided it be understood to include profit gained through a sale or conversion of capital assets."

inference is that having those rents paid to the sellers was a factor in arriving at the total purchase prices.[7] The buyer-partnerships thus enjoyed the economic benefits of the rents when they were paid in the form of reduced purchase prices of the apartment complexes. *Helvering v. Horst*, 311 U.S. 112 (1940). In each case, the rent reservation clause was only a form of security to assure the payment of the stated amounts of "soft dollars" by the buyer-partnerships to the sellers. *Bryant v. Commissioner*, 399 F.2d 800, 805 (5th Cir. 1968), affg. 46 T.C. 848 (1966).

Certainly, if the buyers had simply collected the rent and then paid it over to the sellers as part of the purchase price, there would be no question that the rent was income to the buyers. This, in substance, is what happened, because the buyers owned, controlled, and managed (through agents) the apartments when they produced the rental income. In practical effect, they assigned to the sellers future rental income which was to be used to pay part of the purchase price. Taxation cannot be avoided by drawing up papers to deflect income to others even if the papers take the form of a reservation of rents. Tax liability must be determined by the objective realities and substance of the transaction. As was said in *Corliss v. Bowers*, 281 U.S. 376, 378 (1930), "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." Because, in substance, the buyer-partnerships used the "reserved" rents which they earned by application of their capital and labor to discharge part of the consideration for the apartment complexes, the rents are taxable to petitioners as members of those partnerships.

The courts have repeatedly rejected temporary reservation-of-income arrangements as methods of deflecting the taxation of the "reserved" income from one who owns and controls the income-producing property and enjoys the economic benefits of the income when paid. In *Bryant v. Commissioner, supra*, the taxpayers purchased a farm for a stated price of $925,500. In

---

[7]The inclusion of the $500,000 and the $150,000 of "reserved" rents in the "total consideration" paid for the two properties, as set forth in the prospectuses prepared and issued by CFC, confirms the correctness of this inference.

addition, the sales contract reserved to the seller "production payments" to be satisfied from an undivided one-tenth of the farm's gross income until the amount paid totaled $250,000, plus interest on the unpaid balance.[8] The Court of Appeals for the Fifth Circuit found that the "production payments" were, in substance, part of the purchase price paid by the taxpayers to purchase the farm, stating (399 F.2d at 805) that "the new owner of the property derived a benefit from all the income, including that later remitted to the seller, because with that income he purchased an asset." The payments were, therefore, includable in the taxpayers' gross income. In reaching this conclusion, the court was influenced by factors which are also present in the cases before us: The production payments were limited to a specific amount and were payable over a relatively short term, just as were the reserved rental payments in the present cases. Both of these factors indicated to the court that the "so-called production payment represented only a security interest in the property sold." *Bryant v. Commissioner*, 399 F.2d at 805.

We note that the court in *Bryant* also considered the fact that interest accrued on the unpaid balance of the production payment to be a "sure sign" (399 F.2d at 806) that the payment was, in substance, part of the consideration for the property. In the present cases, this "sure sign" is missing because there was no provision for interest from the date of sale on the unpaid balance of the retained rental payments. The absence of a provision for interest, however, does not require us to find that the reserved rents were not part of the purchase prices. At the time of the sales, it was virtually certain, as we have noted, that the maximum amounts of rental income reserved to the sellers would be fully paid in 3 to 5½ months, and the payments were, in fact, made within that time. We do not think it was necessarily unusual or unrealistic for the unpaid balances due under the rent retention agreements to bear no interest for the short periods that they were to be outstanding.[9]

---

[8]Concurrently with the closing, the seller conveyed his reserved one-tenth interest to a trust for the buyers' children in exchange for $250,000, and it was the trust, rather than the seller, to which the "production payments" were made. This conveyance was, however, immaterial to the resolution of the issue.

[9]Sec. 483, for example, provides generally for the imputation of interest in the case of any contract for the sale of property under which there is "unstated interest," but the section

*Alstores Realty Corp. v. Commissioner*, 46 T.C. 363 (1966), is similarly on point. There, the taxpayer purchased a warehouse. The seller was granted the right to 2½ years of continued occupancy of a portion of the premises "without further payment." The Court held that, although the seller's continued occupancy was ostensibly rent free, the taxpayer-purchaser was required to include the fair rental value of the seller's continued occupancy in its gross income. The Court stated that (at 371):

> although there were no cash payments to petitioner designated as rent after the property was deeded to it, * * * [the seller's] right of occupancy thereafter was a valuable one for which petitioner must have received consideration in some form, and that consideration was in the form of * * * [the seller's] conveyance to petitioner of fee title to the entire building—to the extent that the purchase price of the building exceeded the * * * cash paid therefor * * *

Like the seller's right to continued occupancy of the premises in *Alstores Realty*, the sellers' rights to continue to receive rental income from the properties in the present cases were, in fact, part of the purchase prices in the respective transactions.

Similarly, in *Hibler v. Commissioner*, 46 T.C. 663 (1966), affd. per curiam 383 F.2d 989 (5th Cir. 1967), the purchaser of a fire and casualty insurance business was held taxable on renewal commissions which he earned after the sale and which he was obligated under the sales contract to remit to the seller. The Court stated that (46 T.C. at 672):

> To our way of thinking, in a post-sale income situation such as we have before us here, the buyer should be held taxable when he controls the property, earns future income from it by his own efforts and then uses such income to pay for his purchase.

Petitioners argue that the payments under the rent retention agreements should be taxed to the sellers because it was they who bore the risk that the rental income produced by the properties would be insufficient to provide them with the full amounts to which they were potentially entitled.[10] This

---

does not apply unless some of the payments under the contract are due more than a year after the date of the sale. Sec. 483(c)(1)(A).

[10] The rent retention agreements were not secured by the properties and were not the personal obligations of the purchasers.

uncertainty of return, petitioners argue, is a characteristic of ownership. The sellers' risk in the present cases, however, was very slight. Gross rents in stated amounts were reserved. In the case of each sale, the apartment complex was almost completely rented out at the time of the transaction, and the projections of rental income contained in the prospectuses drawn up by CFC indicated that, even assuming the "worst case," the rental income generated would easily exceed within a short time the maximum amount to which the sellers were entitled under the rent retention agreements.[11] Moreover, as we have noted, affiliates of the sellers managed the apartment complexes after the sales. Although the affiliates were agents for the partnerships, this arrangement, part of the sales transaction, assured efficient and experienced management, thus reducing further any risk that might have been present.[12] Accordingly, we conclude that the sellers' risks were minimal.

Petitioners also argue that it was the sellers, and not they, who benefited from the retained rentals. We agree that the sellers received a benefit from the retained rent, but it was in the form of the benefit of selling the properties, not a benefit derived from operating them. We disagree with petitioners' contention that they, in contrast to the sellers, had no benefit from the rents. As we have discussed, we think it clear that the partnerships used the rents to pay part of the costs of acquiring the properties.

Petitioners cite *Thomas v. Perkins*, 301 U.S. 655, 657 (1937). The taxpayer in that case was assigned an oil lease in consideration of a small cash payment and of $395,000 "to be paid out of the oil produced and saved from the * * * lands." The parties there agreed that the $395,000 was "payable out of oil only if, as and when produced from said lands," and did not

---

[11]The sellers' risk was further reduced by the fact that the sales agreement was, in each case, concluded 1½ to 2 months after the date on which the "benefits and obligations of ownership" were retroactively transferred, well into the rent retention period. The amount of rent that complex would produce during that period was, therefore, partially known at the time the agreement was entered into.

[12]The covenant not to compete and consultation agreement, executed as part of the sale of Town Park, states, in part, that "Seller (including its affiliates) is an entity that operates a number of apartment projects in the Texas area" and "is an experienced developer of apartments and apartment projects."

constitute a personal obligation of the taxpayer. Based on its earlier holdings in *Palmer v. Bender*, 287 U.S. 551 (1933), and *Helvering v. Twin Bell Syndicate*, 293 U.S. 312 (1934), the Supreme Court concluded that the assignors of the oil lease were entitled to an allowance for depletion in respect of the oil sold out of their retained share, and, accordingly, reasoned that the income from that interest was chargeable to them, rather than to the taxpayer.

Petitioners compare the oil payment retained in *Thomas v. Perkins* with the rent retained by the sellers in the present case and argue that the sellers here, like the assignors in *Perkins*, are taxable on the amounts so reserved. The principle of *Thomas v. Perkins*, however, has extremely limited, if any, application outside of the oil and gas tax area. In *Commissioner v. Brown*, 380 U.S. 563, 575–576 (1965), for example, the Supreme Court declined to extend the rule to a stock sale transaction. The Court noted the "peculiar character of the business of extracting natural resources" as viewed by the revenue laws; it is treated as an "income-producing operation" with "its own built-in method of allowing through depletion 'a tax-free return of the capital consumed in the production of gross income through severance,' * * * which is independent of cost and depends solely on production." No such peculiarities exist with respect to renting apartments. In *Bryant v. Commissioner*, 399 F.2d at 803, the court declined to apply *Thomas v. Perkins*, noting that "*Perkins* has not been applied * * * to reserved production interests in property other than depletable minerals." In *Hibler v. Commissioner*, 46 T.C. at 670, the Court declined to extend the *Perkins* rule to "cover an attempted reservation of a specified amount of future income earned by this petitioner in selling fire and casualty insurance renewals." The *Perkins* case is not applicable here.[13]

Moreover, even in the natural resources area, the rule of *Thomas v. Perkins*, *supra*, has been limited if not repealed. Section 636(b), enacted as part of the Tax Reform Act of 1969, provides as follows:

SEC. 636(b). RETAINED PRODUCTION PAYMENT ON SALE OF MINERAL PROPERTY.—A production payment retained on the sale of a mineral

---

[13]For a more extended discussion of the inapplicability of the *Thomas v. Perkins*, 301 U.S. 655 (1937), rule to sales of other property, see this Court's opinion in *Bryant v. Commissioner*, 46 T.C. 848, 857–862 (1966), affd. 399 F.2d 800 (5th Cir. 1968), and cases cited.

property shall be treated, for purposes of this subtitle, as if it were a purchase money mortgage loan and shall not qualify as an economic interest in the mineral property.

The amounts involved in *Thomas v. Perkins* would, therefore, now be treated first as income to the assignee, and then as payments on purchase mortgage loans by the assignors. Significantly, one consideration that led Congress to draft this rule appears to have been that: "This privilege of paying off capital interests out of tax-free dollars [in oil and gas transactions involving retained production payments] is not a privilege accorded the ordinary taxpayer [such as purchasers of apartment buildings]." H. Rept. 91–413 (1969), 1969–3 C.B. 287; S. Rept. 91–552 (1969), 1969–3 C.B. 539. In adopting section 636(b), therefore, Congress expressly recognized that the *Perkins* rule is not applicable outside of the oil and gas tax area.[14]

Petitioners cite *Heminway v. Commissioner*, 44 T.C. 96 (1965). In that case, the taxpayer purchased his sister Madeleine's shares in a family corporation under the condition that Madeleine would receive all dividends "when, as, and if" the company paid them for the shorter of her life or the taxpayer's life plus 5 years.[15] The shares were transferred on the company's books and registered in the taxpayer's name. Dividends thereafter paid to the taxpayer as record owner

---

[14]In *Brountas v. Commissioner*, 692 F.2d 152, 159 (1st Cir. 1982), vacating and remanding 73 T.C. 491 (1979), the court used the following example to illustrate the eccentricity of this aspect of natural resources taxation prior to the enactment of sec. 636:

"Suppose Jones has *sold* * * * [an] apartment house to Smith for $1 million taking $900,000 in cash and the remainder in the form of a "right" to the first $100,000 of rent. * * * the rent is taxed as *Smith's* income, for Jones is considered to have *loaned* Smith the extra $100,000 needed to pay the full $1 million and Smith is considered to be paying back this loan out of the apartment house rent. See *Helvering v. Eubank*, 311 U.S. 122 (1940); *Helvering v. Horst*, 311 U.S. 112 (1940). * * * [This example] would have worked out differently, however, before section 636 if we were dealing with *oil*, rather than apartment houses, for an assignment of what might have looked like future income (or rents) or a retained right to that income—if properly characterized as a "production payment"—was considered to be the income *only* of the person who received (or retained) the payment. * * *"" Although the remarks with respect to an apartment house are dicta, the example is strikingly apposite to the present cases.

[15]This condition was subsequently changed. Under the altered condition, Madeleine was to receive the dividends simply for the remainder of her life.

were remitted by him to Madeleine. The Court held that Madeleine had retained a life interest in the dividends and that they were taxable to her rather than the taxpayer. The case is not apposite. The amounts Madeleine was to receive under her retained life interest were subject to the substantial contingencies of the profitability of the company, the decision of its management to pay dividends or not pay them, and how long she would live. By contrast, the sellers in the present cases were paid out of gross rents, before the deduction of any operating expenses, within short periods of time, and were limited to specified amounts which were practically certain of payment. We think these factors distinguish the sellers' interests in the retained rents from Madeleine's life interest in the dividends in *Heminway*.[16]

Petitioners also cite *Ashlock v. Commissioner*, 18 T.C. 405 (1952). The taxpayer in that case purchased real property by a contract of sale entered into on April 18, 1945. Pursuant to the contract, however, the sellers retained possession of the property for several months following the sale. The sellers retained all rents collected during their period of retained possession, and also paid real estate taxes, insurance premiums, and other expenses of the property during that period. The Court found that the sellers had transferred only a remainder interest in the property to the taxpayer and that the rental income received by the sellers during their period of retained possession was their income, not the taxpayer's. In reaching this conclusion, the Court was influenced by factors not present in the instant cases; the Court found that the sellers "not only retained the rents legally but they also retained control and benefits of ownership" (18 T.C. at 411).

In the present cases, in contrast with *Ashlock*, the "benefits and obligations of ownership," as we have emphasized, were vested in petitioners at all times during the period in which the income in question was earned. Although the sellers, through affiliates, continued to manage the property for a time after the transfer of title, they did so only as paid agents of petitioners, and not on their own behalf. Additionally, unlike the sellers in *Ashlock*, who were entitled to whatever

---

[16]The same factors also distinguish *Bettendorf v. Commissioner*, 49 F.2d 173 (8th Cir. 1931), revg. and remanding 18 B.T.A. 959 (1930), from the present cases.

rents the property produced during a specified period, the sellers in the present cases were limited to specified amounts.

Petitioners next contend that the sellers' interests in the retained rents are considered interests in real property for purposes of Texas property law. We do not dispute this contention, but, even if it is correct, it does not dispose of the matter at issue. It is irrelevant. The classic rule was stated in *Morgan v. Commissioner*, 309 U.S. 78, 80 (1940): "State law creates legal interests and rights. The federal revenue acts designate what interests or rights so created will be taxed." It matters not, therefore, whether the "reserved" rents are, under Texas law, classified as rent a rendre or fee rent or rent seck or rent resolute. They were produced by the partnerships' capital and services and they benefited the partnerships. That is sufficient to render them taxable income of the petitioner-partners.[17]

Petitioners argue alternatively that they and the sellers of Town Park and Villa del Rey were partners in the operation of the complexes for the period of the retained rents, and that the rents were the sellers' distributive share of partnership income under the purported partnership agreement and section 704(a). We do not agree that petitioners and the sellers of the two complexes operated the complexes in partnership.

The question of whether a partnership exists for Federal tax purposes depends on—

whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. [*Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949); fn. ref. omitted.]

---

[17]Taxation is governed by realities rather than by the "attenuated subtleties" of the law of property. *Harrison v. Schaffner*, 312 U.S. 579, 581 (1941); also see, e.g., *Watson v. Commissioner*, 345 U.S. 544, 551 (1953) ("Whether or not the [growing] crop be real property, the federal income tax upon the gain resulting from its sale is, in its nature, a subject of federal law"); *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260 (1958) (proceeds of carved out oil payments taxable to seller as ordinary income even though they were interests in land); *Fleming v. Commissioner*, 24 T.C. 818 (1955), revd. 241 F.2d 78 (5th Cir. 1957), revd. sub nom. *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260 (1958) (exchange of oil payment for ranch was not an exchange of like-kind property even though both interests were real property under State law).

The stipulated facts and related exhibits do not contain even a suggestion that petitioners and the sellers of the complexes intended to form a partnership. The record will not support an inference that they intended to do so. While the sellers or their affiliates continued, in each case, to manage the complex for a short time following the sale, the record is clear that they did so as the buyers' agents or employees, and not as their partners. They were compensated for their management services, and deductions were claimed by CFC—77A and CFC–77C in their Federal income tax returns for management services. Neither those returns nor petitioners' individual returns indicated that a partnership with the sellers existed. Accordingly, we find that the purported partnerships with the sellers were not intended by petitioners and did not, in fact, exist.

Petitioners also make several procedural arguments. They contend that the question of the taxability to them of the reserved rents was not timely raised by respondent and, consequently, may no longer be raised at all. This contention is clearly wrong. Petitioners were not surprised by respondent's argument. Indeed, all the facts in these cases were stipulated. The issue as to the taxability of the rents was extensively briefed by both parties in simultaneously filed briefs. The issue, though not expressly covered by the pleadings, was tried on stipulated facts by consent and is properly before the Court. Rule 41(b)(1).[18]

Petitioners next argue that the issue of the reserved rent constituted a "new matter," with respect to which Rule 142(a) places the burden of proof on respondent. We need not consider this argument, because the stipulated facts and related exhibits provide a sound basis for our decision, regardless of where the burden of proof lies.

Finally, petitioners argue that the parol evidence rule prohibits the Court from considering CFC's statements in its prospectuses for potential investors referred to above. Under that rule, when the parties have reduced their agreement to an integrated writing, extrinsic evidence is not admissible to contradict or vary it in the absence of "fraud, duress, mutual

---

[18]All Rule references are to the United States Tax Court Rules of Practice and Procedure.

mistake, or something of the kind." *Estate of Craft v. Commissioner*, 68 T.C. 249, 259 (1977), affd. 608 F.2d 240 (5th Cir. 1979). This Court, however, has often held that, when respondent was not a party to the instrument involved, formal written documents are not rigidly binding because taxation is concerned with the substance rather than the form of the transaction. *Landa v. Commissioner*, 206 F.2d 431, 432 (D.C. Cir. 1953); *Estate of Craft v. Commissioner*, 68 T.C. at 260, and cases cited therein. Moreover, the statements in the prospectuses do not contradict or vary the terms of the contracts; they merely explain the purpose and intention of the contractors. Furthermore, even if we agreed with petitioners that the parol evidence rule forbade us to consider CFC's statements regarding the agreements in its prospectuses, particularly those referring to the retained rents as part of the "total consideration" for the sales, the result we have reached would be unaffected. Our conclusion that the retained rents were, in fact, part of the consideration for the purchases of the properties is based, not on CFC's characterization of them as such, but on our own view of the objective realities of the transactions. *Frank Lyon Co. v. United States*, 435 U.S. 561, 572–573 (1978).

To reflect the foregoing,

*Decisions will be entered under Rule 155.*