VINCENT E. AND CAROL A. WEBB, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Webb v. Commissioner
Docket No. 15857-85.
United States Tax Court
T.C. Memo 1987-451; 1987 Tax Ct. Memo LEXIS 448; 54 T.C.M. (CCH) 443; T.C.M. (RIA) 87451; September 9, 1987. J. Gordon Hansen and Stuart A. Fredman, for the petitioners. Richard W. Kennedy, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by statutory notice dated March 12, 1985, determined deficiencies in petitioners'' 1981 and 1982 Federal income tax [1] in the amount of $ 1,981 and $ 1,984, respectively. After concessions by the parties, [2] the sole issue presented for our consideration *449 is whether for purposes of computing the gross profit ratio under section 453, [3] property purchased, in part, with a wrap-around mortgage is deemed to be taken "subject to" the underlying indebtedness as stated in section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10710 (Feb. 4, 1981). This case has been submitted fully stipulated pursuant to Rule 122. The stipulation of facts and accompanying exhibits are incorporated herein by reference. Petitioners Vincent E. Webb and Carol A. Webb, husband and wife, resided in Salt Lake City, Utah, at the time of filing the petition in this *450 case. Petitioners filed joint Federal income tax returns for the taxable years 1981 and 1982 [4] using the cash method of accounting. During 19981 and 1982 petitioner was a limited partner in approximately ten limited partnerships, one of which was the CFC-77 Partnership A (CFC 77-A), doing business as Town Park Apartments. CFC 77-A was formed on July 1, 1977, [5] on which date it acquired a 338-unit apartment complex (Town Park) located in Houston, Texas. The approximate cost of the apartment complex was $ 6,000,000. [6]
*451 CFC 77-A, on July 26, 1982, entered into a purchase and sale agreement (Purchase Agreement) with National Property Investors 5 (National), a California limited partnership, to sell the Town Park property for a stated price of $ 9,900,000. Under the terms of the Purchase Agreement, National was required to: (1) Pay a $ 200,000 deposit into escrow upon the signing of the agreement; (2) pay $ 3,150,000 in cash upon closing; and (3) execute and deliver to CFC 77-A, on the closing date, a purchase money note in the amount of $ 6,550,000, secured by a wrap-around deed of trust. On September 21, 1982, the closing date of the sale, National executed and delivered to CFC 77-A a purchase money note in the amount of $ 6,550,000 (the "wrap-around note"). On this date National also executed, in favor of CFC 77-A, a deed of trust as security for the purchase money note (wrap-around deed of trust). At the time of sale [7] there were two mortgages outstanding on the Town Park property (First and Second Deed of Trust) with balance of $ 3,388,093.93 and $ 642,972.33, respectively. The interest rate charged on the first and Second Deed of Trust loans was 8-3/4 percent per annum with a total monthly *452 principal and interest payment of $ 30,369 and $ 5,755, respectively. The notes for the First and Second Deed of Trusts were payable in the year 2002 and 1984, respectively. Under the terms of sale, the wrap-around note was subordinated to the total underlying indebtedness of $ 4,031,066 (senior mortgage). The amount of the wrap-around note represented the unpaid balances of the senior mortgages plus the additional funds CFC 77-A advanced to National (the difference between $ 9,900,000 selling price and $ 3,350,000 deposit received by CFC 77-a); this is referred to as the senior mortgage being "wrapped" in the wrap-around note. The terms of the wrap-around note provided for the accrual of interest at the following rates: From 9/22/82 to 9/19/84
9% per annum
From 9/22/84 to 9/19/86
10% per annum
From 9/20/86 to 9/19/87
10-3/8% per annum
From 9/20/87 to 9/19/88
10-1/2% per annum
From 9/20/88 to 9/19/89
10-5/8% per annum
From 9/20/89 to 9/19/90
10-3/4% per annum
From 9/20/90 to 9/19/91
10-7/8% per annum
From 9/20/91 to 9/19/92
11% per annum
*453 The note has a maturity date of September 19, 1992, and is payable as follows: (1) monthly installments of interest only commencing on October 20, 1982, and on the 20th of each month thereafter including September 20, 1983, computed at the rate of 8-1/4 percent per annum. The difference between interest at this rate and the rate specified above is due on September 20, 1984; (2) monthly installments of interest only at the interest rates specified above commencing on October 20, 1983, and on the 20th of each month thereafter until maturity when the entire unpaid principal balance, together with accrued interest, shall be due and payable. The note provides, in pertinent part, as follows: This note is a wraparound note, and the principal indebtedness evidenced hereby is inclusive on the indebtedness evidenced by (a) a note from Texas Gulf Industries, Inc. to the Mutual Life Insurance Company of New York dated December 19, 1973, and (b) a note from Reica Properties to Town Park Associates dated December 31, 1976. Under the terms of the wrap-around deed of trust National is "Grantor," Jack Baumgardner is "Trustee," and CFC 77-A is "Beneficiary." The pertinent provisions of *454 this deed of trust provides as follows: (a) On page 2 it states that: all rights granted herein are subject and subordinate in all respects to (a) First Lien Deed of Trust dated December 19, 1973 (the "First Deed of Trust") * * * to secure the payment of a $ 3,800,000 note (the "First Lien Note") dated December 19, 1973, payable to the Mutual Life Insurance Company of New York; and (b) Subordinate Deed of Trust dated December 31, 1976 (the "Second Deed of Trust") * * * to secure the payment of a $ 700,000 note (the "Second Lien Note") dated December 31, 1976, payable to Town Park Associates;; and (c) Subordinate Deed of Trust dated August 22, 1974 (the "Supplemental Deed of Trust") * * * to secure the First Lien Note (the First Deed of Trust, Second Deed of Trust and Supplemental Deed of Trust are sometimes collectively referred to herein as the "Underlying Deed(s) of Trust"). (b) Paragraph 7(a) states, in part, that: It is fully understood that Grantor will comply with and will perform in accordance with each, every and all of the terms, covenants and conditions of the Underlying Note(s) and the Underlying Trust Deed(s), other than the payment of installments of principal *455 and interest which Beneficiary agrees to pay hereunder. This covenant shall inure solely to the benefit of the Beneficiary and shall not constitute an assumption of any Underlying Deed of Trust. (d) Paragraph 28 states, in part, that: This Deed of Trust is a wraparound deed of trust, and is subject and subordinate to the Underlying Deeds of Trust. The principal indebtedness of $ 6,550,000 evidenced by the Note includes $ 3,388,093.93 which is the principal balance due on the First Deed of Trust as of the date hereof and $ 642,972.33 which is the principal balance due on the Second Deed of Trust as of the date hereof. Beneficiary agrees to pay all payments of the principal and interest of the Underlying Deeds of Trust occurring from and after the date of this Deed of Trust, in accordance with the terms of the Underlying Deeds of Trust, * * *. (e) Paragraph 29(a) states, in part, that: Beneficiary by accepting this Deed of Trust agrees: To make or cause to be made all payments of principal and interest payable pursuant to the Deed of Trust (as hereinafter defined), on or before the dates on which such payments are due, including any "Balloon Amount" as defined herein. In *456 the event there is no collecting agent as set forth in paragraph 29(f) hereof, Beneficiary agrees to indemnify and hold Grantor harmless from and against any and all liability, duty or responsibility for the payment of the First Lien Note or any part thereof, and any interest, fees and damages which have become or may hereafter become due thereon and for any loss, damage, expense or cost arising from or related to any default under the Underlying Deed of Trust (First) caused by or related to an act or omission of Beneficiary. (f) Paragraph 29(f) states, in part, that: The Beneficiary shall, upon request of Grantor, appoint a person qualified * * * to act at all times as Beneficiary's collecting agent to receive and collect all payments to be made by Grantor to Beneficiary under the Note and this [wrap-around] Deed of Trust and to disburse those payments first to or for the benefit of the beneficiaries under the Underlying Deeds of Trust and then the balance to the Beneficiary. (h) Paragraph 29(h) states, in part, that: Should the aggregate payments required under the Underlying Deeds of Trust exceed for any reason the amount of the monthly installments payable under the [wrap-around] *457 Note, and should Grantor make directly to the beneficiaries of the Underlying Deed(s) of Trust the payments required under the Underlying Deeds of Trust, any such excess shall be accumulated and such excess as accumulated shall be known as the "Accumulated Deficiency" and shall be payable by Beneficiary, together with interest at the Prime Rate * * *. Additionally, the Purchase Agreement specifically addresses the treatment to be given to the underlying indebtedness, stating in pertinent part, as follows: Paragraph 5 The deed [that conveys the apartments to the purchaser] shall expressly provide that the grantee does not assume any responsibility for the payment of the debts secured by the First Deed of Trust and Second Deed of Trust. [Emphasis added.] CFC 77-A on its 1982 tax return, reported the sale of the Town Park property on the installment basis. CFC 77-A computed the gain from this sale using a gross profit percentage [8] that was computed with the total selling price, ($ 9,900,000) used as the contract price. [9] Respondent, [10] using a gross profit percentage for which the selling price [11] was reduced by the underlying indebtedness, recomputed the percentage *458 of gain to be reported on each installment. [12] It is this increased percentage of gain respondent seeks to include in petitioner's income that has resulted in the current dispute. [13] The sole point of contention is how the underlying indebtedness of Town Park should be treated with respect to the computation of the contract price and the gross profit percentage. *459 OPINION Respondent admits that this is a wrap-around financed installment sale [14] which falls within the provisions of section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10710 (Feb. 4, 1981). Petitioner, relying *460 on section 453 and numerous opinions of this court regarding the installment sale of encumbered real property to compute its gain, argues that section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10710 (Feb. 4, 1981), is in direct conflict with established case law, and is wholly inconsistent with the language, legislative history and purpose of section 453, therefore it is invalid. For the reasons set forth below we agree with petitioner. We recently examined section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10710 (Feb. 4, 1981), and held it to be in direct conflict with long established case law; [15] the language, legislative history, and congressional purpose of section 453; and therefore invalid. Professional Equities, Inc. v. Commissioner, 89 T.C.    (July 23, 1987), Slip Opinion at 26. Section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10710 *461 (Feb. 4, 1981), provides, in pertinent part, as follows: Wrap-around Mortgage. A "wrap-around mortgage" means an arrangement in which the buyer initially does not assume and purportedly does not take subject to part or all of the mortgage or other indebtedness encumbering the property ("wrapped indebtedness") and, instead, the buyer issues to the seller an installment obligation the principal amount of which reflects such wrapped indebtedness. Ordinarily, the seller will use payments received on the installment obligation to service the wrapped indebtedness. The wrapped indebtedness shall be deemed to have been taken subject to even though title to the property has not passed in the year of sale and even though the seller remains liable for payments on the wrapped indebtedness * * * [Emphasis added.] Respondent, pursuant to this regulation, asserts that in a wrap-around mortgage transaction the purchaser claims not to take the property "subject to" the underlying indebtedness but that such a transaction will be treated, in the tax law, the same as if the property was taken "subject to" the underlying indebtedness. Respondent's treatment of the wrap-around financed *462 installment sale will not be upheld. In Professional Equities we stated: Since 1955, when this Court found in Stonecrest that the installment sales regulations did not cover the wrap-around variation, we have been allowing the recognition of gain in such wrap-around sales according to our understanding of the statutory mandate. Our conclusion that wrap-around sales are to be taxed under their own distinct method is by now well settled and generally accepted by those courts that have been faced with this issue. * * * [Emphasis added. Footnote ref. omitted. Slip opinion at page 14.] Absent respondent's reliance on the language of section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., he has failed to present any other reason for reconsidering our long established tax treatment of the wrap-around financed installment sale. The position respondent took in section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., had been advanced by him in litigation for a period of time dating from 1955, Stonecrest Corp. v. Commissioner,24 T.C. 659 (1955), [16] to as recent as 1983, Hunt v. Commissioner,80 T.C. 1126 (1983). We have consistently *463 rejected this position. In the Stonecrest line of cases respondent has repeatedly argued that installment sales transactions involving wrap-around notes should be accorded the same tax treatment as transactions in which the property was taken by the purchaser "subject to" the outstanding mortgages or where the purchase "assumed" such mortgages. We have rejected respondent's argument, and have consistently held that where the subject of the transaction is not the same as where the purchaser takes the property "subject to" or "assumes" the mortgages outstanding against the property, the transaction will not be taxed pursuant to section 1.453-4(c), Income Tax Regs.[17]
*464 In Stonecrest, the corporate taxpayer constructed and sold individual homes. Under the terms of sale, the purchaser agreed to pay to the seller a total purchase price which included the outstanding balance of, as of the date of sale, a senior mortgage obtained and held by the seller. Relying upon the general rule of the predecessor of section 453, the taxpayer computed the amount of gain to be reported from each payment received based on the position that the purchaser neither "assumed" the outstanding mortgage nor took the property "subject to" such mortgage. The Commissioner challenged the position taken by the taxpayer and argued that the purchaser either took the property "subject to" the mortgage or "assumed" the mortgage. This Court, after examining the economic substance of a transaction in which the purchaser takes the property "subject to" or "assumes" the mortgage, held for the taxpayer In holding for the taxpayer we stated that the terms "assumed" and "taken subject to," as used in section 29.44-2, Regs. 111 (not section 1.453-1(c), Income Tax Regs.), must be given the interpretation ordinarily attributed to them in property transactions. Upon examining the application *465 of these terms in property law, we held that in a transaction involving the assumption of the mortgage the purchaser incurs an obligation on the underlying indebtedness that is generally enforceable by the mortgagee, and where the purchaser takes the property "subject to" the mortgage, the seller does not remain liable on the mortgage. Rather, the seller has no obligation to make payments on the mortgage which, upon default, will be satisfied from the proceeds of the sale of the property. In such a transaction the purchaser, to secure his interest in the property, will generally make the payments on the outstanding mortgage. See Stonecrest v. Commissioner, supra at 666. Following the Stonecrest analysis, the distinction of whether the property has been taken "subject to" the senior mortgage or whether the purchase "assumed" such mortgage has been consistently applied to installment sales disputes in which respondent challenged the taxpayer's computation of the gross profit percentage. [18] In each case where this Court has refused to apply section 1.453-4(c), Income Tax Regs., the transaction was found to be, in substance, different from those transactions this *466 regulation was designed to address. [19] In each of these cases the method of financing the transactions required a portion of the purchase price to be paid to the mortgagee on the underlying indebtedness, without being taxed to the seller. In Professional Equities, Inc. v. Commissioner, 89 T.C.   , (July 23, 1987), Slip Opinion at 11-12, this Court, cognizant of this difference, stated: [T]he Court [in Stonecrest] recognized that the regulations applying to "subject to" and "assumed" sales were carefully tailored to the specific circumstances presented in the "subject to" and "assumed" situations. Those specific circumstances were that, in those types of sales, the entire sales price would not be paid directly to the seller of the property but instead would be paid in part to the seller's mortgagee in satisfaction of the underlying mortgage. The regulations increased the proportion to be used to tax gain by reducing the contract price by the underlying mortgages because, in the context of "subject to" and "assumed" sales, if they did not, they would tax too small a proportion of each payment. However, if that adjusted proportion were applied to wrap-around sales *467 in which the full price was paid directly to the seller, too much gain would be recognized too soon * * * [Emphasis added. Cite omitted.] *468 In the wrap-around financed transaction the full purchase price is paid and taxed to the seller. In this type of transaction no part of the purchase price escapes taxation to the seller, therefore, there is no need to apply a greater gross profit percentage to the installment payments the seller receives. Thus, as we stated in Professional Equities, Inc., there is no support in the language or legislative intent of section 453 for extending the "subject to" tax treatment to true wrap-around financed transactions. We reject respondent's argument that section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., was promulgated to carry out the Congress' intent of the Installment Sale Revision Act of 1980. Congress, in enacting the Installment Sale Revision Act, intended to liberalize the eligibility requirements of section 453, thereby making the installment method of reporting more widely available. Additionally, the Senate Finance committee stated that the Installment Sale Revision Act was enacted to simplify present law under section 453. [20] The Commissioner, however, caused the opposite result with section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10710 *469 (Feb. 4, 1981). The computation of two gross profit percentages, required under this regulation, is but one example of the complexity of section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs. These temporary regulations totally ignore the economic realities of a wrap-around financed transaction. Although the seller in a wrap-around financed transaction does not recognize as much gain in the year of sale as if he had "assumed" the underlying mortgage, [21] taxpayers have the right to structure business dealings in a way that may decrease their tax burden. Gregory v. Helvering,466 U.S. 465, 469 (1935). A wrap-around financed transaction is composed of different form, substance, and economic risks than a "subject to" financed transaction, but is none the less to be given effect. Section 15A.453-1(b)(3)(ii), Temporary Income Tax Regs., ignores these differences. Accordingly, Decision will be entered for the petitioner.
*470 Footnotes
1. Respondent, in his notice of deficiency, made numerous adjustments to petitioner's loss deductions taken with respect to ten partnerships in which petitioner held interests. ↩
2. The parties have settled all issues, except the adjustments to the capital gains resulting from the sale of Town Park apartments, CFC-77 Partnership A, (CFC 77-A). ↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. Carol A. Webb is a party to this case solely by filing a joint income tax return with her husband, Vincent E. Webb. Reference will be made hereafter, singularly, to Vincent E. Webb as petitioner. ↩
5. CFC 77-A's general partners were (1) Clark Financial Corporation and (2) S. Spence Clark. For the 1982 taxable year the partnership had 40 limited partners. ↩
6. The 1977 and 1978 tax returns for CFC 77-A were examined by the audit division of the Internal Revenue Service and certain adjustments were proposed. The case was subsequently petitioned to this Court and a stipulation of facts was entered into by the parties. The stipulation of facts resolved many of the issues that were in dispute. The issues that remained were decided by this Court in Ellison v. Commissioner,80 T.C. 378↩ (1983), resulting in an increase in CFC 77-A's basis in the apartment complex. 7. The closing statement shows the date of the actual sale to be Sept. 21, 1982. However, the outstanding balances were taken as of Sept. 22, 1982. We do not think this is of any meaningful significance in the resolution of the issue before us. ↩
8. The gross profit percentage is computed by dividing the total gross profit realized on the sale by the total contract price. It is the computation of the total contract price that is in dispute. The gross profit percentage, as computed by CFC 77-A, was 77.24 percent. ↩
9. Sec. 15A.453-1(b)(3)(iii), Temporary Income Tax Regs., 46 Fed. Reg. 107109 (Feb. 4, 1981), defines contract price as follows: The term "contract price" means the total contract price equal to selling price reduced by that portion of any qualifying indebtedness * * * assumed or taken subject to by the buyer, which does not exceed the seller's basis in the property * * *. ↩
10. Respondent proposed some adjustments to the computation of the gain realized on the sale including adjustments to correct the basis of the property to take into account adjustments agreed to in Ellison v. Commissioner,80 T.C. 378↩ (1983). 11. Sec. 15A.453-1(b)(2)(ii), Temporary Income Tax Regs., states, in pertinent part, as follows: Selling price defined.↩ The term "selling price" means the gross selling price without reduction to reflect any existing mortgage or other encumbrance on the property (whether assumed or taken subject to by the buyer) and without reduction to reflect any selling expenses. Neither interest, whether stated or unstated, nor original issue discount is considered to be a part of the selling price * * *. 12. The parties have agreed that $ 53,356 of the gain resulting from the sale is sec. 1250 recapture income. ↩
13. Respondent's method requires each partner to report as gain 98.33 percent of payments received. Petitioner's share of the gain was computed as follows: ↩
Partnership adjustment
$ 767,371
multiplied by petitioner's profit sharing %
.5877%
Adjustment allocated to petitioner
4,510
60 % capital gain deduction
2,706
Increased proposed to petitioner's income
$1,804
14. We note that paragraph (f) of the wrap-around Deed of Trust permits the seller, at the request of the purchaser, to appoint a collecting agent for the seller, to receive and collect all payments due to the seller and to distribute these payments first to or for the benefit of the mortgagees on the underlying indebtedness. Respondent has not challenged this provision as rendering the genuineness of the wrap-around note herein involved invalid, therefore, we do not consider this. We note, however, that the facts and circumstances of this case illustrate that the parties intended to have this clause inserted merely as a protective device if the grantor fails to meet obligations under the agreement. Should this clause become operative the nature and effect of the wrap-around note may change. See Goodman v. Commissioner,74 T.C. 684 (1980), affd. without published opinion 673 F.2d 1332↩ (7th Cir. 1981). 15. Stonecrest Corp. v. Commissioner,24 T.C. 659 (1955), 1956-1 C.B. 6; Estate of Lamberth v. Commissioner,31 T.C. 302 (1958); United Pacific Corp. v. Commissioner,39 T.C. 721↩ (1963). 16. For convenience we will refer to this case as "Stonecrest.↩" 17. This distinction in treatment has been applied by this Court in the following cases: Stonecrest Corp. v. Commissioner, supra;Estate of Lamberth v. Commissioner, supra;United Pacific Corp. v. Commissioner, supra;Voight v. Commissioner,68 T.C. 99 (1977), affd. per curiam 614 F.2d 94 (5th Cir. 1980); Maddox v. Commissioner,69 T.C. 854 (1978); Republic Petroleum Corp. v. United States,613 F.2d 518 (5th Cir. 1980), affg. 397 F. Supp. 900 (E.D. La. 1980); Goodman v. Commissioner, supra;Hunt v. Commissioner,80 T.C. 1126↩ (1983). 18. See Estate of Lamberth v. Commissioner, supra;United Pacific Corp. v. Commissioner, supra;Hunt v. Commissioner, supra.↩
19. In each case where this Court has applied section 1.453-4(c), Income Tax Regs., to the transaction, the substance of the transaction was that of a "subject to" or "assumption of" transaction executed in the form of a wrap-around financed transaction. See Voight v. Commissioner, supra, (The Court found that because the purchaser had guaranteed and made payments on the outstanding indebtedness to the senior mortgages that the intent of the parties was to have the underlying indebtedness "assumed by" the purchaser.); Maddox v. Commissioner, supra, (The purchaser obtained a new mortgage and used some of these funds to retire the senior mortgage outstanding on the property. The Court, in applying the substance over form analysis, held that the transaction was in substance an "assumption of" the underlying mortgage. The Court noted that the transaction could not qualify as a wrap-around mortgage because at the completion of the transaction the seller retained no liability on the underlying indebtedness.); Republic Petroleum Corp. v. United States, supra, (In an attempt to avoid the application of "assumption of" tax treatment seller belatedly restructured a sale to his majority-owned corporation. However, the Fifth Circuit Court of Appeals, in applying the substance over form doctrine, held that the purchaser had "assumed" the underlying mortgage, therefore section 1.453-4(c) Income Tax Regs., was applicable to the transaction.); Goodman v. Commissioner, supra,↩ (Under the terms of the purchase agreement the purchaser (trusts) were required to make the payments on the apparent wrap-around note to a bank, as seller's collecting agent. The bank was required to make the monthly payments on the underlying mortgage and pay any excess funds to the seller. The Court, placing great emphasis on the escrow arrangement established by the parties, held that the purchaser had, in substance, acquired the property "subject to" the existing indebtedness.). 20. S. Rept. No. 96-1000 at 7 (1980), 1980-2 C.B. 494↩. 21. In the "assumption of" or "subject to" financed sale the seller must include any excess underlying indebtedness over the seller's adjusted basis in the property as payment received in the year of sale. This increases the amount of gain reported in that year. ↩